No. 22-2786, 22-2846

# In the
# United States Court of Appeals
## for the Seventh Circuit

―――――――

ST. AUGUSTINE SCHOOL, et al.,
PLAINTIFFS-APPELLANTS,

*v.*

JILL UNDERLY AND FRIESS LAKE SCHOOL DISTRICT,
DEFENDANTS-APPELLEES

―――――――

ST. AUGUSTINE SCHOOL, et al.,
PLAINTIFFS-APPELLEES,

*v.*

JILL UNDERLY,
DEFENDANT-APPELLANT

―――――――

On Appeal from a Judgment of the United States District Court
for the Eastern District of Wisconsin
The Honorable Lynn Adelman Presiding,
Case No. 2:16-cv-00575

―――――――

## BRIEF OF PLAINTIFFS-APPELLANTS

―――――――

WISCONSIN INSTITUTE FOR LAW & LIBERTY, INC.

RICHARD M. ESENBERG
*Counsel of Record*
ANTHONY F. LOCOCO
330 E. Kilbourn Ave., Suite 725
Milwaukee, WI 53202
Phone: (414) 727-9455
Facsimile: (414) 727-6385
*Attorneys for Plaintiffs-Appellants*

## RULE 26.1 DISCLOSURE STATEMENT

1.  The full name of every party that the attorney represents in the case:

    St. Augustine School and Joseph and Amy Forro.

2.  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Wisconsin Institute for Law & Liberty, Inc.

3.  If the party or amicus is a corporation:

    (i) Identify all its parent corporations, if any; and

    Not applicable.

    (ii) List any publicly held company that owns 10% or more of the party's or amicus' stock:

    Not applicable.

<div style="margin-left:40%">

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

*s/ Anthony F. LoCoco*
Richard M. Esenberg (WI Bar No. 1005622)
*Counsel of Record*
Anthony F. LoCoco (WI Bar No. 1101773)
330 E. Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Facsimile: (414) 727-6385
Rick@will-law.org
ALoCoco@will-law.org

</div>

i

## TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT ........................................................ I

JURISDICTIONAL STATEMENT ................................................................ 1

STATEMENT OF ISSUES ......................................................................... 5

STATEMENT OF THE CASE .................................................................... 6

    I.   INTRODUCTION ....................................................................... 6

    II.   FACTUAL BACKGROUND ...................................................... 13

        A.  Wisconsin's Transportation Aid Laws ................................ 13

        B.  The Parties ........................................................................ 15

        C.  St. Augustine's Transportation Aid Request and its Denial .......... 17

    III.  PROCEDURAL BACKGROUND.............................................. 19

        A.  The District Court's First Decision ..................................... 19

        B.  The First Appeal ................................................................ 20

        C.  Remand, Certification, and this Court's Second Decision .............. 22

        D.  The District Court's Second Decision and this Appeal .................... 26

    IV.  POST-FILING FACTUAL DEVELOPMENTS ..................................... 28

SUMMARY OF ARGUMENT ................................................................... 29

STANDARD OF REVIEW ....................................................................... 30

ARGUMENT.......................................................................................... 31

    I.   The District Court was required and authorized to resolve the Plaintiffs' federal constitutional claim asserted under 42 U.S.C. § 1983. ................................................................................. 31

    II.  The Defendants violated the Plaintiffs' First Amendment rights when they denied the Plaintiffs otherwise-available public benefits "for reasons that can be tied to [the Plaintiffs'] religious preference" and based "exclusively . . . on a doctrinal determination" the Defendants had made............................................. 37

        A.  The Defendants violated the Establishment Clause by defining St. Augustine's denominational affiliation. ....................... 38

        B.  The Defendants violated the Free Exercise Clause by forcing St. Augustine to choose between following its faith tradition and the receipt of otherwise-available government benefits.......... 41

C. The Defendants violated the Religion Clauses by interfering with St. Augustine's ability to define its faith and doctrine............ 45

III. The Plaintiffs are entitled to $9,000 in money damages, declaratory relief, and injunctive relief. ................................................ 48

A. The Forros are entitled to $9,000 in damages from Friess Lake School District. ................................................................................ 49

B. The Plaintiffs are entitled to a declaratory judgment and St. Augustine is entitled to a permanent injunction. ............................ 51

CONCLUSION ................................................................................................ 52

# TABLE OF AUTHORITIES

## Cases

*Auto. Mechanics Loc. 701 Welfare & Pension Funds v. Vanguard Car
Rental USA, Inc.*, 502 F.3d 740 (7th Cir. 2007) ................................... 49

*Boim v. Am. Muslims for Palestine*,
9 F.4th 545 (7th Cir. 2021) ..................................................... 10

*Burgess v. Ryan*,
996 F.2d 180 (7th Cir. 1993) ................................................... 34

*Carlsbad Tech., Inc. v. HIF Bio, Inc.*,
556 U.S. 635 (2009) ............................................................... 33

*Deakins v. Monaghan*,
484 U.S. 193 (1988) ............................................................... 35

*Delgado v. U.S. Dep't of Justice*,
979 F.3d 550 (7th Cir. 2020) ................................................... 39

*Duncan Place Owners Ass'n v. Danze, Inc.*,
927 F.3d 970 (7th Cir. 2019) ................................................... 51

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ............................................................... 52

*Employment Division v. Smith*,
494 U.S. 872 (1990) ............................................................... 44

*Espinoza v. Montana Dept. of Revenue*,
140 S. Ct. 2246 (2020) ..................................................... passim

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ................................................... 52

*Henderson v. Sheahan*,
196 F.3d 839 (7th Cir. 1999) ................................................... 49

*Holy Trinity Cmty. Sch., Inc. v. Kahl*,
82 Wis. 2d 139, 262 N.W.2d 210 (1978) ................................... 14

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
565 U.S. 171 (2012) ......................................................... 22, 46

*Hughes Tool v. Co. v. Trans World Airlines*,
409 U.S. 363 (1973) ............................................................... 26

*In re Burlington N. Santa Fe Ry. Co.*,
606 F.3d 379 (7th Cir. 2010) ................................................... 33

*In re Mut. Fund Mkt.-Timing Litig.*,
468 F.3d 439 (7th Cir. 2006) ................................................... 28

*Joelner v. Vill. of Washington Park, Illinois,*
    378 F.3d 613 (7th Cir. 2004)...............................................................52

*Kennedy v. Bremerton Sch. Dist.,*
    142 S. Ct. 2407 (2022).................................................................40, 45

*Lemon v. Kurtzman,*
    403 U.S. 602 (1971).......................................................................8, 38

*Lyng v. Nw. Indian Cemetery Protective Ass'n,*
    485 U.S. 439 (1988)...............................................................9, 34, 40

*Markel Insurance Company v. Rau,*
    954 F.3d 1012 (7th Cir. 2020)...........................................................31

*McCullah v. Gadert,*
    344 F.3d 655 (7th Cir. 2003).............................................................34

*Mkt. St. Assocs. Ltd. P'ship v. Frey,*
    941 F.2d 588 (7th Cir. 1991).............................................................33

*Monroe v. Pape,*
    365 U.S. 167 (1961)...................................................................10, 33

*New York v. Cathedral Academy,*
    434 U.S. 125 (1977)...................................................................38, 40

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
    140 S. Ct. 2049 (2020) ("*OLG*").................................................46, 47

*Presbyterian Church v. Mary Elizabeth Blue Hull*
    *Mem'l Presbyterian Church,* 393 U.S. 440 (1969)................................41

*Robbins v. Lady Baltimore,*
    868 F.2d 258 (1989) .........................................................................34

*Simpson v. Rowan,*
    73 F.3d 134 (7th Cir. 1995)................................................................35

*State ex rel. Vanko v. Kahl,*
    52 Wis. 2d 206, 188 N.W.2d 460 (1971) ........................................14, 37

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    *137 S. Ct. 2012 (2017)*.....................................................................44

*United States v. Ballard,*
    322 U.S. 78 (1944)............................................................................41

*United States v. Lee,*
    455 U.S. 252 (1982)..........................................................................41

*Uzuegbunam v. Preczewski,*
    141 S. Ct. 792 (2021).........................................................................51

*Yee v. City of Escondido*, Cal.,
    503 U.S. 519 (1992)................................................................22

*Zinermon v. Burch*,
    494 U.S. 113 (1990)................................................13, 33, 36

**Rules, Statutes, and Constitutions**

28 U.S.C. § 1254 ...................................................................2

28 U.S.C. § 1291 ...............................................................2, 4

28 U.S.C. § 1331 ...................................................................1

28 U.S.C. § 1367 ...............................................................1, 32

28 U.S.C. § 1441 ...................................................................1

42 U.S.C. § 1983 ...........................................................passim

42 U.S.C. § 1988 .................................................................49

Federal Rule of Appellate Procedure 4 ..............................3

Federal Rule of Civil Procedure 54 .............................3, 49

Federal Rule of Civil Procedure 59 ....................................3

U.S. Court of Appeals for the Seventh Circuit Rule 52 ...................24

U.S. Court of Appeals for the Seventh Circuit Rule 54 ...................22

Wis. Stat. § 121.51.......................................8, 13, 17, 18

Wis. Stat. § 121.54.......................................13, 17, 40

Wis. Stat. § 121.55.......................................13, 50

Wis. Stat. § 821.01.......................................................2

Wis. Stat. §§ 121.51–121.55 ...........................................1

## JURISDICTIONAL STATEMENT

The Plaintiffs[1] originally filed this action in state court on April 8, 2016. (Dkt. 1, 1-1; 1-2.)[2] The Defendants removed the action to the United States District Court for the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1441. (Dkt. 1.) The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 as this is a civil action arising under the Constitution and laws of the United States. Specifically, the Plaintiffs asserted causes of action arising under the United States Constitution's First and Fourteenth Amendments (Equal Protection Clause, Free Exercise Clause, and Establishment Clause) and under 42 U.S.C. § 1983. (Dkt. 1-2:8–9.) The Plaintiffs also asserted a state law claim arising under Wis. Stat. §§ 121.51–121.55. (Dkt. 1-2:10.) The District Court had supplemental jurisdiction of the Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367.

On June 6, 2017, the District Court granted the Defendants' joint motion for summary judgment in part, dismissing the Plaintiffs' federal claim on the merits; denied the Plaintiffs' motion for summary judgment; declined to exercise supplemental jurisdiction over the Plaintiffs' state law claim, remanding that claim to state court pursuant to 28 U.S.C. § 1367(c)(1) based on the Court's view that it

---

[1] To avoid confusion arising from the fact that this action involves cross-appeals, this brief uses "Plaintiffs" and "Defendants" as shorthand rather than any appellate designations.

[2] In this brief and in the appendices, "Dkt." refers to the District Court docket, "R." refers to this Court's docket in the previous appeal (appeal No. 17-2333), and "RR." refers to the docket in this appeal (appeal No. 22-2786).

"raise[d] a novel or complex issue of State law"; and denied Defendant Underly's motion to dismiss as moot. (App. 42–66.)

On June 28, 2017, the Plaintiffs appealed to this Court, challenging only the resolution of their federal claim. (Dkt. 43.) No party challenged the District Court's remand of the Plaintiffs' state law claim or its denial as moot of the Superintendent's motion to dismiss. The Seventh Circuit had jurisdiction pursuant to 28 U.S.C. § 1291 and affirmed the judgment of the District Court on October 11, 2018. (App. 68–95.) On December 7, 2018, this Court denied the Plaintiffs' petition for rehearing *en banc*. (App. 97.) The Plaintiffs then filed a Petition for Writ of Certiorari with the Supreme Court of the United States on March 6, 2019. (*See* R. 48.) The Supreme Court had jurisdiction under 28 U.S.C. § 1254(1). On July 2, 2020, the Supreme Court granted the Petition, vacated the Seventh Circuit's judgment, and remanded the case to this Court for further consideration. (*See* App. 98, 101.)

On February 16, 2021, following supplemental briefing, this Court certified a question to the Supreme Court of Wisconsin *sua sponte* under 7th Cir. R. 52(a) and Wis. Stat. § 821.01. (App. 105–110.) The Supreme Court of Wisconsin answered the certified question on July 2, 2021 and remanded the case to this Court for further proceedings. (*See* App. 114–194.) On December 20, 2021, this Court reversed the June 6, 2017 judgment of the District Court and remanded for further proceedings consistent with its opinion. (App. 195–206.) This Court denied the Plaintiffs' petition for rehearing on January 19, 2022. (App. 208.) On March 25, 2022, the Plaintiffs filed a second Petition for a Writ of Certiorari in the Supreme Court of the United

States.  (*See* R. 86.)  The Supreme Court denied the petition on June 6, 2022.  (*See* App. 209.)

On September 19, 2022, the District Court granted in part and denied in part the Plaintiffs' motion for summary judgment, entering a declaratory judgment that the Defendants had violated Wisconsin law; granted in part and denied in part the Defendants' motions for summary judgment on all claims other than for declaratory relief under state law; denied the Superintendent's motion to dismiss; and ordered the Clerk of Court to enter final judgment.  (App. 1–32.)  The Clerk of Court entered final judgment the same day.  (App. 33.)  There are no claims left for disposition in the District Court.

This appeal is taken from the final Decision and Order and final Judgment of the United States District Court for the Eastern District of Wisconsin entered on September 19, 2022, the Honorable Lynn Adelman presiding, disposing of all parties' claims.  (*See* App. 1–33.)

On September 30, the Plaintiffs filed a motion for attorney's fees under Federal Rule of Civil Procedure 54(d)(2) and asked the District Court to either order that the motion have the same effect under Federal Rule of Appellate Procedure 4(a)(4) as a timely motion under Federal Rule of Civil Procedure 59(e) to alter or amend a judgment or deny the motion without prejudice while directing a new period for filing the motion under Federal Rule of Civil Procedure 54(d)(2)(B) after any appeal has been resolved.  (Dkt. 83.)  On October 4, 2022, the District Court issued an Order

denying the motion without prejudice and authorizing the Plaintiffs to renew their motion for fees following the resolution of any appeal. (App. 210–211.)

On October 6, 2022, the Plaintiffs filed a Notice of Appeal from the District Court's September 19, 2022, final Decision and Order and final Judgment. (Dkt. 85.) This Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 1291. This appeal is docketed as No. 22-2786.

On October 18, 2022, Defendant Underly filed a Notice of Appeal from the District Court's September 19, 2022, final Decision and Order and final Judgment. (Dkt. 90.) That appeal is docketed as No. 22-2846. On October 20, 2022, this Court ordered appeal Nos. 22-2786 and 22-2846 consolidated for purposes of briefing and disposition. (RR. 3.)

## STATEMENT OF ISSUES

1.    Was the District Court both required and authorized to resolve the Plaintiffs' federal constitutional claim asserted under 42 U.S.C. § 1983?

**The District Court "generally agree[d]" with the Plaintiffs that their state-law claim is no longer at issue in this suit and that regardless, "the existence of overlapping state remedies does not prevent a plaintiff from seeking relief under federal law via 42 U.S.C. § 1983"—in other words, that it would ordinarily be required to resolve the Plaintiffs' federal claim—but concluded that this Court's prior decision did not leave it "free to grant relief on" that claim. (App. 15–16.) This Court should reverse.**

2.    Did the Defendants violate the Plaintiffs' First Amendment rights in light of this Court's express conclusion that the Defendants denied them otherwise-available public benefits "for reasons that can be tied to [the Plaintiffs'] religious preference" and based "exclusively . . . on a doctrinal determination" the Defendants had made? (App. 198, 205.)

**In dicta, the District Court rejected the Plaintiffs' constitutional claims on the merits. This Court should reverse.**

3.    Assuming the answer to the previous question is "yes," to what remedy are the Plaintiffs entitled for the violation of their constitutional rights?

**The District Court did not reach this question. This Court should direct the District Court to award the Plaintiffs $9,000 in money damages, declaratory relief, and injunctive relief.**

5

## STATEMENT OF THE CASE

### I.     INTRODUCTION

The justice system is failing St. Augustine School and Joseph and Amy Forro. It is *undisputed* that the Defendants—governmental entities—engaged in prohibited religious decision-making when they told St. Augustine that it belonged to a particular religious denomination over its explicit objection, then used that decision to deny St. Augustine families their transportation aid under Wisconsin's (unchallenged) rule limiting aid to one school per sponsoring group per area. (*See, e.g.*, App. 198 (decision of this Court) ("We conclude that the Superintendent's decision in the case before us was not justified by neutral and secular considerations, but instead necessarily and exclusively rested on a doctrinal determination that both St. Augustine and St. Gabriel's were part of a single sponsoring group—the Roman Catholic church—because their religious beliefs, practices, or teachings were similar enough.").)

Yet, somehow, after over six and a half years of litigation in state circuit court, the District Court, this Court, the Supreme Court of the United States, and the Supreme Court of Wisconsin, the Plaintiffs are no closer to obtaining the relief they have been after since this case was first filed: payment of the unlawfully-withheld money, a declaration that their First Amendment rights were violated, and a permanent injunction prohibiting the Defendants from repeating their conduct.

The genesis of the quagmire that this case has become is easy to identify. When this case went up on its first appeal, this Court had little difficulty resolving

the Plaintiffs' federal constitutional claim, albeit in the Defendants' favor, characterizing the federal issues as "the heart of this case." (App. 75.) The one dissenting judge likewise viewed this as a constitutional case. (*See, e.g.*, App. 91–95 (Ripple, J., dissenting).)

Once the Plaintiffs successfully obtained an order from the Supreme Court of the United States vacating this Court's decision and ordering this Court to reconsider the Plaintiffs' constitutional claim in light of *Espinoza v. Montana Dept. of Revenue*, 140 S. Ct. 2246 (2020), however, everything changed, and somehow this was no longer a constitutional case. Following two rounds of supplemental briefing on the merits of the constitutional question (consistent with the Supreme Court's order), this Court announced the following:

> When we first considered it, the plaintiffs were urging that the state defendants were violating their rights under the [First Amendment]. . . . At this juncture, however, the issue has boiled down to one dispositive question of state law: what methodology for determining affiliation is required under the relevant Wisconsin statutes? If, as Judge Ripple urged, state law requires the authorities to use neutral criteria such as corporate structure, then there is no need for us to say anything further about the Religion Clauses of the U.S. Constitution. There is no such relationship between the two schools, and the St. Augustine families will get their benefits.

(App. 106–07.) This Court did not ask the Plaintiffs for their input on whether they were still urging that their federal constitutional rights had been violated (they were). Nor did this Court ask for the parties' input on whether the state law question it had identified *sua sponte* was indeed "dispositive" (as explained in detail below, it is not).

Instead, this Court sent the parties to engage in briefing and argument before the Supreme Court of Wisconsin on how Wis. Stat. § 121.51 should be applied.

If anything, however, the Supreme Court of Wisconsin's decision further confirmed the need to determine the federal constitutional claim in this case. That Court repeatedly made clear that its interpretation of the statute was controlled by the First Amendment. (App. 135 ("[A] superintendent attempting to determine that a school is affiliated with a specific religious denomination may rely on any evidence of affiliation between the school and a denomination that does not violate the First Amendment and that does not inquire into the religious beliefs of the school or the denomination.").)

But on remand from certification, this Court issued a decision that would confound not only the Plaintiffs but also the District Court. Although the *only* claim in this case is a federal constitutional claim—the state claim having been remanded to state court many years ago—this Court concluded that the federal claim's disposition was unnecessary. (App. 204.) It instead issued what appeared to be an advisory opinion concluding only that state law had been violated through the Defendants' religious decision-making. It did so even though under this Court's reasoning any state law violation *clearly* disclosed a federal violation, such that it was not really avoiding a constitutional disposition at all:

> [A]s a matter of state law [the Superintendent] may not delve into "the school's religious beliefs, practices, or teachings," *because the latter inquiry would transgress the First Amendment prohibition against excessive entanglement with religious matters. See Lemon v. Kurtzman,* 403 U.S. 602, 613 (1971).

8

> We conclude that the Superintendent's decision in the case before us was not justified by neutral and secular considerations, but instead necessarily and exclusively rested on a doctrinal determination that both St. Augustine and St. Gabriel's were part of a single sponsoring group—the Roman Catholic church—*because their religious beliefs, practices, or teachings were similar enough.*

(App. 197–98 (emphases added).)

In other words, to that point the case had unfolded as follows: (1) the Plaintiffs brought a federal and a state claim in state court; (2) the Defendants removed the case to federal court; (3) the District Court decided the federal claim and remanded the state claim to state court; (4) in reversing, this Court decided a state law claim no longer pending in this case and not pursued by the Plaintiffs and left the federal claim unanswered (and unexamined under *Espinoza* as the Supreme Court had ordered must be done).

Even if the Plaintiffs' state law claim for certiorari review or a declaration were somehow transported back into this federal forum, *sub silentio*, almost five years after its remand and against the will of the Plaintiffs who had brought it, it has never been in dispute that the panoply of remedies that the Plaintiffs have sought under § 1983— in particular, compensatory damages for past denied benefits—is not available under state law. (*See* App. 18.) Thus, a declaration that the Defendants violated state law, while not unwelcome, was in no way dispositive of this case for purposes of avoiding the constitutional question. *See, e.g., Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) (constitutional avoidance doctrine required lower courts to "determine, before addressing the constitutional issue, *whether a decision on that*

*question could have entitled respondents to relief beyond that to which they were entitled on their statutory claims*" and "*[i]f no additional relief would have been warranted*, a constitutional decision would have been unnecessary and therefore inappropriate" (emphases added)); *see also Monroe v. Pape*, 365 U.S. 167, 183 (1961) ("It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy.").

This Court's conclusion that disposition of the federal claim would be unnecessary under a state law ruling providing that "the St. Augustine families will get their [prospective] benefits," (App. 107), then, appeared to be a judicial decision on the Plaintiffs' behalf that they no longer desired to recover past unlawfully denied benefits, permanent injunctive relief to prevent this from happening again, and a declaration that their First Amendment rights were violated. But "the plaintiffs are the master of their complaint." *Boim v. Am. Muslims for Palestine*, 9 F.4th 545, 557 (7th Cir. 2021). They did not bring this lawsuit only to secure state-law declaratory relief. Congress was more generous than that in establishing 42 U.S.C. § 1983.

The Plaintiffs raised these concerns to this Court at the earliest opportunity following this Court's indication in its certification order that it might not resolve the federal issues, namely following resolution of proceedings before the Supreme Court of Wisconsin. (*See* R. 70:14–16.) But this Court did not address the arguments in its subsequent decision or even mention them. The Plaintiffs then re-raised these concerns in a petition for rehearing or clarification, asking that this Court at least provide guidance as to how the parties were to comply with its order to brief remedy

10

before the District Court on remand, (*see* App. 206), given that this Court had not decided any claim to which a remedy could attach. (R. 82.) This Court denied the motion without comment. (App. 208.)

This Court's approach perplexed the District Court. (*See* App. 3 ("[T]he Seventh Circuit's latest opinion creates a bit of a mystery.").) The District Court agreed with the Plaintiffs that disposition of their federal claim was the required approach, but felt that this Court had simultaneously barred it from doing so. (App. 16.) So it granted declaratory relief on a state law claim that does not exist in this case (the reason for the Superintendent's cross-appeal) and declined to resolve the federal claim that does exist (the reason for the Plaintiffs' appeal). (App. 32.) Thus, following several rounds of briefing before this Court, briefing and argument before the Supreme Court of Wisconsin, and a second full round of summary judgment briefing before the District Court, the parties find themselves back before this Court in much the same position they were in in July of 2020 when the Supreme Court vacated this Court's first decision: with St. Augustine's sole claim in this case, a federal claim, unanswered. Did the Defendants violate the First Amendment or not?

This case is not just about the Plaintiffs. The average private school does not have the resources to engage in seven years of litigation across five different courts to recover a few thousand dollars in transportation benefits. This case is sending a strong message to religious adherents across the State of Wisconsin that whatever the Bill of Rights may guarantee, whatever remedies Congress may afford private citizens, if a government entity violates federal rights of ordinary private citizens,

even in a degrading manner—"Your belief that there is a distinction between St. Augustine and St. Gabriel's regarding adherence to Catholic principles is your fight, not ours.  You both call yourself Catholic Schools" (Dkt. 26-6:1)—they will get away with it.  (*See also* App. 109 ("This suggests that a great number of Wisconsin students are potentially affected by the resolution of the question before us.").)

They will get away with it even though, again, it is undisputed that the challenged conduct constituted government pronouncements on religious matters, obviously prohibited conduct.  Indeed, in 2018, when this Court ruled *against* the Plaintiffs, it agreed that "had the defendants determined that St. Augustine was Catholic on the basis of an affinity between its teachings or practices and those sanctioned by chosen dioceses, orders, or prelates, we would have found the defendants' inquiry to be unconstitutional."  (App. 79.)  In 2021, this Court then ruled that the Superintendent's decision "necessarily and exclusively rested on a doctrinal determination that both St. Augustine and St. Gabriel's were part of a single sponsoring group—the Roman Catholic church—because their religious beliefs, practices, or teachings were similar enough."  (App. 198.)  No rule, binding or prudential, requires or counsels in favor of a refusal by this Court to simply state the syllogism that those two passages produce.  The Defendants violated the First Amendment.

This proceeding provides the opportunity for this Court to right the ship. Congress provided § 1983 not only for "violations of constitutional rights that are authorized by state law," but also for "abuses of state authority that are forbidden by

the State's statutes"—in other words, for this case. *Zinermon v. Burch*, 494 U.S. 113, 124 (1990).

This Court can and should acknowledge the ineluctable implication of its prior decision: the Defendants violated the First Amendment when they told the Plaintiffs to what religion they belonged over the Plaintiffs' objection and then denied public benefits on that basis. And, because the question of remedy is fully briefed and involves only questions of law, this Court should determine the appropriate remedies rather than remand for yet another iteration of proceedings and appeals. It is time to put this case to bed.

## II.     FACTUAL BACKGROUND

### A.     Wisconsin's Transportation Aid Laws

Under Wisconsin law, qualifying private school students are entitled to transportation to and from school in the form of transportation services or transportation funding. *See generally* Wis. Stat. §§ 121.54(2)(b), 121.55. To qualify for transportation to a particular private school, the student must reside a minimum distance from the school and within that school's "attendance area," *see* Wis. Stat. § 121.54(2)(b). The school's "attendance area" is "the geographic area designated by the governing body of a private school as the area from which its pupils attend and approved by the school board of the district in which the private school is located." Wis. Stat. § 121.51(1). Although private schools are largely unconstrained when drawing attendance areas, Wis. Stat. § 121.51(1) provides that "[t]he attendance

areas of private schools affiliated with the same religious denomination shall not overlap."[3]

Confronted with a question over the constitutionality of a requirement that seemingly applied only to religious schools, the Wisconsin Supreme Court in 1971 construed the prohibition on overlapping attendance areas to apply "to all private schools affiliated or operated by a single sponsoring group, whether . . . secular or religious." *State ex rel. Vanko v. Kahl*, 52 Wis. 2d 206, 215, 188 N.W.2d 460 (1971). In a subsequent case, the Wisconsin Supreme Court further clarified that in applying the prohibition on overlapping attendance areas to religious schools, government officials could not "meddle into what is forbidden by the Constitution[:] the determination of matters of faith and religious allegiance." *Holy Trinity Cmty. Sch., Inc. v. Kahl*, 82 Wis. 2d 139, 150, 262 N.W.2d 210 (1978).

This case arose because of the illegal actions the Defendants took in determining the threshold question of affiliation. Even though it is undisputed that there is no legal, operational, or other secular connection between St. Augustine and the Roman Catholic Church as represented by the local Archdiocese of Milwaukee, and even though it is undisputed that St. Augustine considers itself to be religiously distinct from the schools of the Archdiocese, the Defendants took it upon themselves to designate St. Augustine and an Archdiocesan school as "affiliated with the same religious denomination" simply because they both lay claim to the title "Catholic." In

---

[3] This rule is subject to an exception involving single-sex schools not relevant here. *See* Wis. Stat. § 121.51(1).

so doing, the Defendants went so far as to reject the school's sincere professions about its own religious identity.

## B.    The Parties

St. Augustine School is a private elementary and high school located in Hartford, Wisconsin (and, since 2021, Colgate, Wisconsin). (Dkt. 26 at ¶2; Dkt. 22 at ¶1; Dkt. 63 at ¶4; Dkt 61 at ¶52.) St. Augustine is an independent religious school that teaches and operates in a manner that it believes is consistent with the long-standing traditions of the Catholic faith. (Dkt. 26 at ¶3; Dkt. 22 at ¶5.) It is operated and under the control of its own board of directors under the terms of its own articles of incorporation and by-laws. (Dkt. 26 at ¶4; Dkt. 22 at ¶6.) It is not operated by any religious order of the Catholic Church and is not affiliated with the Catholic Archdiocese of Milwaukee in any way. (Dkt. 26 at ¶7; Dkt. 22 at ¶10.) Nor is it affiliated with any other school, Catholic or otherwise. (*Id.*) It is not subject to the ecclesiastical authority of the Archbishop or otherwise affiliated with or subject to the control of any organ of the Roman Catholic Church. (Dkt. 26 at ¶10; Dkt. 22 at ¶12.) Although no religious tests may be employed here, St. Augustine believes that it operates more fully within the Catholic tradition than Archdiocesan schools. (*Id.*) In other words, St. Augustine considers itself religiously distinct from schools operated by the Archdiocese. (Dkt. 26 at ¶10; Dkt. 22 at ¶13.)

St. Gabriel School is a private school in Hubertus, Wisconsin. (Dkt. 25 at ¶2; Dkt. 22 at ¶14.) It is operated under the authority of the Archdiocese of Milwaukee (the "Archdiocese"). (*Id.*) It is under the ecclesiastic authority of the Archbishop and

must comply with the Grade Specific Catholic Education Curriculum for elementary schools sponsored by the Archdiocese. (Dkt. 25 at ¶¶2, 4; Dkt. 22 at ¶15.)

St. Augustine's curricula and values are determined solely by its own board of directors, administration, and staff. (Dkt. 26 at ¶9; Dkt. 22 at ¶17.) St. Augustine does not follow the Archdiocesan religious curriculum for high school students set by the U.S. Conference of Catholic Bishops for schools sponsored by the Archdiocese. (Dkt. 26 at ¶10; Dkt. 22 at ¶18.) Nor does it recognize or need to comply with the Grade Specific Catholic Education Curriculum for elementary schools sponsored by the Archdiocese. (*Id.*) The employees of the school, including the teachers, are selected by the administrators of the school, who are in turn selected by the school's board of directors. (Dkt. 26 at ¶11; Dkt. 22 at ¶19.)

The Plaintiffs, Joseph and Amy Forro, have three children who attended St. Augustine School from 2015 to 2021. (Dkt. 24 at ¶3; Dkt. 22 at ¶21; Dkt. 62 at ¶¶2–3; Dkt. 61 at ¶¶56–57.) While attending St. Augustine, the Forro children lived more than 2 miles from St. Augustine and lived within the attendance area of St. Augustine. (Dkt. 24 at ¶4; Dkt. 22 at ¶22; Dkt. 26 at ¶13; Dkt. 62 at ¶¶2–3; Dkt. 61 at ¶¶56–57.) The Forros chose to send their children to St. Augustine specifically because of its traditional religious values which the Forros believe to be different from those of an Archdiocesan school. (Dkt. 24 at ¶5; Dkt. 22 at ¶24.) The Forros did not consider it a choice between two equivalent Catholic schools—St. Augustine or St. Gabriel—but instead a choice between a school that implements their religious values

(St. Augustine) and other schools, public and private (including those operated by the Archdiocese), that do not.  (Dkt. 24 at ¶5; Dkt. 22 at ¶25.)

### C.    St. Augustine's Transportation Aid Request and its Denial

On April 27, 2015, St. Augustine made a request pursuant to Wis. Stat. § 121.54 to Friess Lake for transportation for the Forro children to and from St. Augustine School.  (Dkt. 26 at ¶15; Dkt. 26-4; Dkt. 22 at ¶31.)  Friess Lake denied the request on April 29, 2015 (Dkt. 26 at ¶20; Dkt. 26-8; Dkt. 22 at ¶33) and reaffirmed that denial on September 22, 2015.  (Dkt. 26 at ¶18; Dkt. 26-6; Dkt. 22 at ¶33.)

As noted above, under Wisconsin law, each private school is entitled to an attendance area for transportation purposes.  *See* Wis. Stat. § 121.51(1).  St. Augustine's attendance area includes the entire geographic area that makes up the Friess Lake School District.  (Dkt. 26 at ¶14; Dkt. 22 at ¶¶23, 30; Dkt. 63 at ¶5; Dkt. 61 at ¶53.)

On April 29, 2015, St. Augustine was informed by Friess Lake that the "Friess Lake School District Board of Education did not approve [St. Augustine's] stated attendance area" because St. Augustine's attendance area overlaps with the attendance area of St. Gabriel (a private school operated by the Archdiocese).  (Dkt. 26 at ¶20; Dkt. 26-8; Dkt. 22 at ¶33.)  Friess Lake took the position that St. Gabriel and St. Augustine School are affiliated because they both say that they are Catholic schools. (Dkt. 26 at ¶21; Dkt. 26-6; Dkt. 22 at ¶36.)  As a result, Friess Lake refused

to approve St. Augustine's attendance area and refused to provide transportation to the Forro children.  (*Id.*)

In rejecting the request for transportation, Friess Lake expressly applied a religious test.  Even though examination of St. Augustine's corporate charter and by-laws reveals its independence, and even though there has never been any dispute about a total lack of legal ties between St. Augustine and the Archdiocese, because St. Augustine says on its website that it is "Catholic," Friess Lake decided that St. Augustine is affiliated with other schools, like those of the Archdiocese, who also say that they are "Catholic."  Although it had no business evaluating the school's religious character, Friess Lake did precisely that.  In fact, although religious differences between St. Augustine and the Archdiocese ought to be irrelevant, Friess Lake even judged and rejected St. Augustine's claim that "there is a distinction between St. Augustine and St. Gabriel's regarding adherence to Catholic principles."  (Dkt. 26-6; Dkt. 22 at ¶37.)

Pursuant to Wis. Stat. § 121.51(1), if there is a dispute between a school district and a private school regarding an attendance area, the dispute can be referred to the Superintendent of Public Instruction.  The dispute between St. Augustine and Friess Lake regarding St. Augustine's attendance area was submitted to Superintendent Evers in December 2015.  (Dkt. 26 at ¶23; Dkt. 22 at ¶42.)  On March 10, 2016, Superintendent Evers, through his designee, Michael Thompson, Deputy Superintendent of Public Instruction, issued a decision upholding Friess Lake's

determination that St. Gabriel and St. Augustine School were affiliated because St. Augustine said that it was Catholic. (Dkt. 26 at ¶26; App. 34–41; Dkt. 22 at ¶45.)

The Superintendent's legal analysis contains no facts concerning any corporate or other secular affiliation between St. Gabriel and St. Augustine, and no facts establishing that St. Gabriel and St. Augustine are affiliated or operated by a single sponsoring group. (Dkt 26 at ¶28; App. 37–41; Dkt. 22 at ¶46.) Rather, the Decision announced a state policy that schools that the State determines are the same religious denomination because they use the same label or title may not have overlapping attendance areas, regardless of a total lack of secular ties between the schools and regardless of what the schools themselves say those labels mean.

## III.    PROCEDURAL BACKGROUND

### A.    The District Court's First Decision

The Plaintiffs sued the Defendants in state court in April of 2016 alleging both federal constitutional violations under 42 U.S.C. § 1983 and a state statutory violation; the Defendants removed to federal court. (*See* App. 48.) On June 6, 2017, following cross-motions for summary judgment, the District Court issued a decision in favor of the Defendants with respect to St. Augustine's federal claims. (*See id.* at 65–66.) It declined to exercise supplemental jurisdiction over St. Augustine's state-law claim and remanded that claim to state court. (*Id.* at 66.) Finally, it denied a motion to dismiss filed by the Superintendent as moot. (*Id.*)

**B.     The First Appeal**

The Plaintiffs appealed to this Court.  (*See* App. 68–96.)  The Plaintiffs raised two principal issues relevant here: first, whether the Defendants had violated the Free Exercise Clause by forcing the Plaintiffs to choose between calling themselves "Catholic" and receiving transportation benefits; and second, whether the Defendants had violated the Establishment Clause by concluding that when St. Augustine and St. Gabriel each used the term "Catholic," they meant the same thing.  (*See id.* at 68–69.)

On October 11, 2018, this Court affirmed in a 2-1 decision, concluding that no constitutional violations had occurred.  (*Id.* at 69.)    This Court acknowledged, but found constitutionally unproblematic, that its ruling meant that "St. Augustine had to choose between identifying as Catholic and securing transit funding for its students." (App. 76.)  In other words, as long as St. Augustine called itself "Catholic" it did not matter that its religious beliefs were different from those of the Archdiocese; it would be denied benefits.

This Court also concluded that the Defendants did not engage in "an impermissible inquiry into the religious character of St. Augustine."  (*Id.* at 78.) Instead, they merely "read and credited St. Augustine's statements on its website and busing request form that it was a Catholic—specifically a Roman Catholic—school." (*Id.* at 79.)  The fact that St. Augustine repeatedly protested that it is religiously distinct from schools operated by the Archdiocese did not matter according to the Court because St. Augustine had "assign[ed] the label 'Catholic'" to itself.  (*Id.*)

Judge Ripple dissented, criticizing the Court's decision as an "exercise in label reading." (App. 95 (Ripple, J., dissenting).) More specifically, he condemned the Court's conclusion that "if two schools employ the same label—'Catholic'—to describe themselves, they are 'affiliated.'" (*Id.* at 90.) In Judge Ripple's view, in determining whether two schools are affiliated, "the Constitution requires the state to rely on the same neutral principles it would apply to a non-religious school," namely "St. Augustine's independent corporate structure," and "[t]he materials submitted to the Superintendent made the Superintendent well aware that St. Augustine is legally independent from St. Gabriel and the Archdiocese." (*Id.* at 91.)

Judge Ripple noted that the Court's resolution had implications for other faiths. It would allow the State to determine that the Evangelical Lutheran Church in America and the Lutheran Church Missouri Synod were the same religious denomination because they both call themselves Lutherans, or that Reform Judaism and Orthodox Judaism are the same denomination, or that Sunni and Shi'a Islam are the same denomination. (*Id.* at 94–95.) He argued that the decision "raise[d] haunting concerns about the future health of the Religion Clauses in this circuit" and was "difficult to square" both with the Supreme Court's statement in *Trinity Lutheran* that "denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion" and "with the basic tenet of the Supreme Court's Religion Clauses jurisprudence that the Constitution protects not only the 'freedom to believe' but 'the freedom to act.'" (*Id.* at 95 (first quoting

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017), then quoting *Cantwell v. Connecticut*, 310 U.S. 296, 303–04 (1940)).)

Following the Seventh Circuit's denial of the Plaintiffs' petition for rehearing en banc, (App. 97), the Plaintiffs timely filed a Petition for Writ of Certiorari with the Supreme Court of the United States on March 6, 2019. (*See* R. 48.) In advancing again the arguments discussed above, the Plaintiffs also contended that the Seventh Circuit's decision conflicted with certain of the Supreme Court's cases on church autonomy, *see, e.g.*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012). *See* Petition for Writ of Certiorari 38-41[4]; *Yee v. City of Escondido*, Cal., 503 U.S. 519, 534 (1992) ("Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.")

On July 2, 2020, the Supreme Court granted the Plaintiffs' petition, vacated the Seventh Circuit's judgment, and remanded the case for further consideration in light of *Espinoza*, 140 S. Ct. 2246. (App. 98.)

## C.    Remand, Certification, and this Court's Second Decision

Back before this Court, the parties filed Circuit Rule 54 statements with the Court, and then, pursuant to this Court's order, supplemental briefs. (R. 52–67; App. 102–04.) The Plaintiffs argued in part that it was irrelevant for constitutional

---

[4]    *Available* on the Supreme Court docket at https://www.supremecourt.gov/DocketPDF/18/18-1151/90856/20190306115759328_2019-03-06%20Separate%20USSC%20Petition%20for%20Writ%20of%20Certiorari.pdf.

purposes whether the Defendants told the Plaintiffs "you may not call yourself religious if you want benefits" as had occurred in *Espinoza* or instead "you may not call yourself a Catholic if you want benefits."   (R. 61:11–12.)   Either way the Defendants were applying "indirect coercion," *Espinoza*, 140 S. Ct. at 2256 (quoting *Trinity Lutheran*, 137 S. Ct. at 2022), to the Plaintiffs to, as Judge Ripple had suggested, "bend to the school board's determination that what they believe to be an important religious difference between the two schools does not exist or is inconsequential" and to "modify" their religious exercise. (App. 93–94 (Ripple, J., dissenting).)   *Espinoza* makes clear that this state of affairs is impermissible.

However, although the Supreme Court had ordered this Court to examine the case in light of *Espinoza*, and although the extensive briefing addressed precisely this issue, this Court did not issue an opinion discussing the federal claim in light of *Espinoza*.   Instead, on February 16, 2021, this Court *sua sponte* certified to the Supreme Court of Wisconsin the following question:

> For purposes of determining whether two or more schools are "private schools affiliated with the same religious denomination" for purposes of Wis. Stat. 121.51, must the state superintendent rely exclusively on neutral criteria such as ownership, control, and articles of incorporation, or may the superintendent also take into account the school's self-identification in sources such as its website or filings with the state[?]

(App. 109–110.)  In this Court's view, if "state law requires the authorities to use neutral criteria such as corporate structure, then there is no need for us to say anything further about the Religion Clauses of the U.S. Constitution" because

"[t]here is no such relationship between the two schools, and the St. Augustine families will get their benefits."  (*Id.* at 106–07.)

The Wisconsin Supreme Court answered the certified question in an opinion issued on July 2, 2021.  (*Id.* at 114–94.)  It explained:

> We conclude that, in determining whether schools are "affiliated with the same religious denomination" pursuant to Wis. Stat. § 121.51, the Superintendent is not limited to consideration of a school's corporate documents exclusively. In conducting a neutral and secular inquiry, the Superintendent may also consider the professions of the school with regard to the school's self-identification and affiliation, but the Superintendent may not conduct any investigation or surveillance with respect to the school's religious beliefs, practices, or teachings.

(App. 118.)  It made clear that its decision was driven by the First Amendment.  (*See id.* at 133–138.)

The Wisconsin Supreme Court expressly declined to apply its holding to the facts of this case.  (*Id.* at 118.)  But it observed that while the Superintendent could consider a school's "professions" in conducting an affiliation inquiry, "[h]ere St. Augustine professes that *while it is Roman Catholic, it is independent of and unaffiliated with the Archdiocese*."  (*Id.* at 136 (emphasis added).)  That is, if the Defendants were to base their decisions on the professions of St. Augustine in this case then they should have decided for the Plaintiffs because the "profession" St. Augustine made was that it was independent of and unaffiliated with the Archdiocese.  The Defendants were required to take St. Augustine at its word.

The parties thereafter filed Circuit Rule 52(b) statements before the Seventh Circuit.  (R. 70, 72–76.)  In its statement, St. Augustine explained that although the

24

Wisconsin Supreme Court's decision plainly disclosed a violation of state law, the only claim currently pending in this case was the § 1983 claim for violations of the First Amendment (because the District Court had remanded the state claim to state court) and that this Court was still required to resolve it in light of *Espinoza* under the U.S. Supreme Court's mandate.  (R. 70:2.)

On December 20, 2021, this Court issued an opinion reversing the District Court's judgment.  (App. 195–206.)  It concluded that "the Superintendent's decision in the case before us was not justified by neutral and secular considerations, but instead necessarily and exclusively rested on a doctrinal determination that both St. Augustine and St. Gabriel's were part of a single sponsoring group—the Roman Catholic church—because their religious beliefs, practices, or teachings were similar enough."  (*Id.* at 198.)  Further, this Court explained that the Superintendent had "with[eld] state benefits for reasons that can be tied to the religious preference of the disfavored group," namely St. Augustine.  (*Id.* at 205.)

Although these statements were tantamount to a holding that the First Amendment was violated, this Court for unexplained reasons said that it did "not find it necessary to reach any constitutional issues in this case."  (*Id.* at 204.)  It concluded that it was "enough to decide whether the Superintendent properly applied Wisconsin law" and decided that he had not done so.  (*Id.* at 204–06.)  It then ordered the District Court to "determine," on remand, "the amount of monetary damages (if any) to which the Forros or St. Augustine might be entitled, or what type of injunctive relief (if any) for any plaintiff is proper."  (*Id.* at 206.)

St. Augustine filed a petition for rehearing and/or for clarification, again pointing out that the state law claim had been remanded and arguing that because under Supreme Court case law "overlapping state remedies are generally irrelevant to the question of the existence of a cause of action under § 1983," there *must* be resolution of St. Augustine's constitutional claim in this case.  (R. 82:4 (quoting *Zinermon v. Burch*, 494 U.S. at 124).  St. Augustine concluded its petition as follows:

> [O]n remand, St. Augustine intends to argue that . . . this Court expects the District Court to resolve St. Augustine's § 1983 claim.  The Defendants may oppose this view of the Court's decision.  Clarification by this Court on the question would thus save the parties and the District Court the need to litigate the question.

(*Id. at* 10–11.)  This Court denied the petition without comment.  (App. 208.)

The Plaintiffs again sought relief from the Supreme Court of the United States, which denied the Plaintiffs' second Petition for a Writ of Certiorari on June 6, 2022. (*See* App. 209.)  This denial, of course, "impart[ed] no implication or inference concerning the Court's view of the merits."  *Hughes Tool v. Co. v. Trans World Airlines*, 409 U.S. 363, 365 n.1 (1973).

### D.    The District Court's Second Decision and this Appeal

On remand, meanwhile, the District Court had directed the parties to file cross-motions for summary judgment.  (Dkt. 57.)  The parties took drastically different positions in their motions: the Plaintiffs argued that the District Court was required and authorized to decide their federal claim and that the state claim was not properly before it, (*see, e.g.*, Dkt. 60:14–18); Friess Lake argued that this Court had resolved the Plaintiffs' state-law claim on its own motion and barred the District

Court from deciding the federal claim, (*see, e.g.*, Dkt. 69:7–8); and the Superintendent argued neither claim was before the District Court, (*see, e.g.*, Dkt. 66:1-3). The Superintendent additionally attempted to renew its 2016 motion to dismiss on immunity-related grounds, an attempt the Plaintiffs argued was improper both procedurally and substantively. (*See id.* at 20–22; Dkt. 72:27–32.)

On September 19, 2022, the District Court issued its final decision and order. (App. 1–32.) Judgment was entered the same day. (App. 33.)

In its decision, the District Court "generally agree[d]" with the Plaintiffs that their state-law claim was no longer at issue in the suit and that regardless, "the existence of overlapping state remedies does not prevent a plaintiff from seeking relief under federal law via 42 U.S.C. § 1983"—in other words, that it would ordinarily be required to resolve the Plaintiffs' federal claim—but concluded that this Court's prior decision did not leave it "free to grant relief on" that claim. (App. 15–16.) In its view, this Court had "implicitly reinstated the plaintiffs' state-law claim and instructed [the District Court] to determine whether the plaintiffs are entitled to injunctive relief or damages under state law." (App. 17.) The Court concluded that by abandoning the attempt to obtain such relief under state law, the Plaintiffs had "waived any entitlement" to those remedies "under state law." (*Id.* at 17–18.) Nevertheless, the Court noted that, in any event, "damages and injunctive relief appear[ed] to be unavailable in an action for common law certiorari under Wisconsin law." (*Id.* at 18.) Finally, it viewed the entry of a declaratory judgment "embod[ying]" this Court's "state-law ruling" as appropriate. (*Id.*)

The District Court then proceeded to address and deny on the merits the Plaintiffs' federal constitutional claims in dicta, explaining that "[e]xpressing [its] view on the outcome of the constitutional claims now avoids the possibility that the Seventh Circuit will determine that [the District Court] erred in thinking that its mandate precluded [it] from considering the constitutional claims and then remanding the case to [it] for a third time to consider the merits in the first instance." (*Id.* at 16.) The District Court also denied the Superintendent's motion to dismiss. (*Id.* at 32.)

On October 6 and October 18, 2022, the Plaintiffs and the Superintendent, respectively, filed notices of appeal from the District Court's final decision, order, and judgment. (Dkt. 85, 90.) Friess Lake has not appealed, meaning that the District Court's state-law declaration will remain in place vis-à-vis Friess Lake even if the Superintendent prevails. *See, e.g.*, *In re Mut. Fund Mkt.-Timing Litig.*, 468 F.3d 439, 443 (7th Cir. 2006).

## IV.    POST-FILING FACTUAL DEVELOPMENTS

A few notable factual developments occurred during the pendency of this suit. First, in 2018, Friess Lake School District and Richfield Joint School District No. 1 were consolidated into the Holy Hill Area School District ("HHASD"). (Dkt. 61 at ¶61.) That consolidation has no effect on this suit. *See* Fed. R. Civ. P. 25(c).

Second, following the denial of its initial 2015 request, St. Augustine submitted transportation requests for each year thereafter through the 2021–22 school year, none of which were approved. (Dkt. 63 at ¶¶2–3, 6; Dkt. 61 at ¶¶49–51, 54; Dkt. 74

28

at ¶¶1–2; Dkt. 73 at ¶¶3–4.)  At the time of the District Court's 2017 decision, the Forros had lost transportation aid for the 2015–16 *and* 2016–17 school years, something the District Court explicitly noted.  (*See* App. 48.)  Since that time, however, the Forro children continued attending St. Augustine for the 2017–18, 2018–19, 2019–20, and 2020–21 school years, and they lost transportation aid for those years as well.  (Dkt. 62 at ¶¶2–4; Dkt. 61 at ¶¶56–58; Dkt. 73 at ¶4; Dkt. 74 at ¶3.)  Following the 2020–21 school year, the Forros left the school.  (Dkt 62 at ¶5; Dkt. 61 at ¶59.)

Third, beginning in the 2021–22 school year, St. Augustine changed its address to 4908 Monches Rd., Colgate, WI 53017, approximately 4.5 miles south of its previous location.  (Dkt. 63 at ¶4; Dkt. 61 at ¶52.)  However, its attendance area remains unchanged.  (Dkt. 63 at ¶5; Dkt. 61 at ¶53.)

Finally, and most recently, St. Augustine applied to Holy Hill Area School District for transportation benefits for its families for the 2022–23 school year.  (Dkt. 73 at ¶5; Dkt. 74 at ¶4.)  In May of 2022, for the first time, HHASD approved the attendance area.  (Dkt. 77 at ¶5.)  But it continues to maintain that its conduct was constitutional, has not paid the Forros the unlawfully-withheld benefits, and has not made any formal policy changes to ensure that it does not repeat its conduct.

As shown below, none of these more recent factual developments changes the Plaintiffs' rights or their entitlement to the remedies they seek.

## SUMMARY OF ARGUMENT

The Plaintiffs' argument proceeds in three parts.

First, the Plaintiffs will show that the District Court was required and authorized to resolve the Plaintiffs' federal constitutional claim. That is so both because the only other claim in this case, the state-law claim, was remanded to state court many years ago and because even if the state-law claim were still present it would not be dispositive of the federal claim. The District Court was authorized to resolve the claim because this Court's decision did not foreclose it from doing so.

Second, on the merits of the federal constitutional claim, the Defendants violated the First Amendment rights of the Plaintiffs in three ways: (1) they violated the Establishment Clause by placing the government in the quasi-ecclesiastical role of adjudicating religious questions; (2) they violated the Free Exercise Clause by forcing religious adherents to choose between participating in an otherwise-available government aid program and self-identifying by their preferred religious label; and (3) they violated both Religion Clauses by infringing on the autonomy of a religious organization to define its own mission free of government intrusion.

Third, this Court should resolve the question of remedy now rather than remand for additional proceedings and appeals. The Forros are entitled to damages, St. Augustine is entitled to a permanent injunction to prevent the Defendants from repeating their conduct, and both Plaintiffs are entitled to declaratory relief.

## STANDARD OF REVIEW

This Court "review[s] *de novo* a district court's decisions on cross-motions for summary judgment," "constru[ing] all facts and inferences therefrom in favor of the party against whom the motion under consideration is made." *Markel Insurance*

*Company v. Rau*, 954 F.3d 1012, 1016 (7th Cir. 2020) (quoting *In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006)).

## ARGUMENT

**I.    The District Court was required and authorized to resolve the Plaintiffs' federal constitutional claim asserted under 42 U.S.C. § 1983.**

In 2021 this Court reversed the 2017 judgment of the District Court and remanded it to that Court "for further proceedings consistent with this opinion." (App. 206.)  The Defendants had argued that the only matter left for resolution in this case following that remand was a determination of remedy owed (if any).  That cannot be true because there was no judgment on a claim upon which to base a remedy.  Specifically, the District Court should have, but did not, resolve the Plaintiffs' federal claim on the merits.  This is so because there is no state claim at issue in this suit, only a federal claim.  Additionally, even if the state claim is still at issue, it does not supplant the Plaintiffs' federal claim.

In its 2016 state court complaint, St. Augustine asserted a federal claim under 42 U.S.C. § 1983 for violations of the First Amendment[5] and a state law claim for violation of Wisconsin's transportation statutes.  (Dkt. 1-2 at 8–10.)  The Defendants chose to remove to federal court.  (Dkt. 1.)  On summary judgment, the District Court relinquished jurisdiction of the state law claim and remanded it to state court and then granted summary judgment to the Defendants on the First Amendment claims

---

[5] St. Augustine also argued that the Equal Protection Clause had been violated but has since abandoned that position.

and remanded the state law claim to state court.  (App. 65–66.)  That was over five years ago (on June 6, 2017).  The federal judiciary has lost jurisdiction of the state law claim.

The District Court's decision to remand was a discretionary decision made under 28 U.S.C. § 1367(c)(1) and was not appealed by any party.  (*See, e.g.*, R. 8:14 n.5.)  Because it was not appealed by any party, this Court never had any reason to revisit this Court's remand decision and it was certainly too late for any party to seek to undo that decision on remand from this Court's 2021 decision.  In other words, the state claim was not before this Court when it issued either of its decisions, was not before the U.S. Supreme Court when it issued its Order, and was not before the District Court on remand.  That claim, having been remanded to state court, is no longer at issue in this suit.  Only the federal claim remains to be decided.  With no decision on the federal claim, there can be no decision on remedy.

Although the District Court was sympathetic to the Plaintiffs' position, given the nature of this Court's opinion, the District Court felt constrained to rule that this Court had "implicitly reinstated the plaintiffs' state-law claim." (App. 14.)  But with respect to the District Court, that is an incredible suggestion.  The parties are not here dealing with some prudential decision over whether a claim is forfeited, say, but instead with the simultaneous exercise of jurisdiction by separate sovereigns over a case.  This Court has admonished the "bench and bar of this circuit" on more than one occasion "that it is their nondelegable duty to police the limits of federal jurisdiction with meticulous care." *Mkt. St. Assocs. Ltd. P'ship v. Frey*, 941 F.2d 588,

589 (7th Cir. 1991). Relevant here, much ink has been spilled concerning *exactly* what federal courts may do with respect to review of § 1367 remand orders. Not all remand orders are even reviewable on appeal, and it was not until 2009 that the Supreme Court confirmed that the type of remand orders in this case (*i.e.* one under §1367(c)) is reviewable. *See Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635 (2009). Thus, even assuming that this Court had the power to do it, the idea that this Court reversed the District Court's relinquishment of jurisdiction and resurrected a five-year-old state claim (to displace the pending federal claim), all without saying so, is not believable. Contrast, for example, decisions of this Court where, as part of its *judgment*, the Court explicitly "vacates" a district court's remand order. *See, e.g.*, *In re Burlington N. Santa Fe Ry. Co.*, 606 F.3d 379, 381 (7th Cir. 2010). That was not done here. The remand order was not touched.

But there is a much more important point. Even if the state law claim were still somehow at issue in this case, the Supreme Court has held, with respect to § 1983 claims, and this Court has reaffirmed, that "overlapping state remedies are generally irrelevant to the question of the existence of a cause of action under § 1983." *Zinermon*, 494 U.S. at 124. As the Court explained in *Monroe v. Pape*, "[i]t is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy." 365 U.S. at 183 (emphasis added); *see also, e.g.*, *Zinermon*, 494 U.S. at 124 (explaining that in *Monroe* the Court had rejected the notion that § 1983 "applies only to violations of constitutional rights that are authorized by state law, and does not reach abuses of state authority that are

33

forbidden by the State's statutes"); *Burgess v. Ryan*, 996 F.2d 180, 184 (7th Cir. 1993) ("[I]t is not appropriate for a federal court, hearing a case under § 1983, to upbraid state officials for a supposed error of state law. . . . Constitutional adjudication tests the power of a state to act in a particular way; whether the state indeed wishes to act in that way is a question of its domestic law."); *McCullah v. Gadert*, 344 F.3d 655, 660 (7th Cir. 2003). The Defendants have no right (especially at this point) to tell the Plaintiffs that a state law remedy is "good enough." Congress has afforded the Plaintiffs a federal remedy, and they are entitled to that remedy.

The Defendants' general response to this argument has been to note the general rule that "federal courts must not rule on constitutional issues where other, nonconstitutional dispositive grounds are available." *Robbins v. Lady Baltimore*, 868 F.2d 258, 262 (1989). But this Court did not cite this rule or discuss it in its 2021 decision. And it is obvious why: the Court would have had to determine whether the state law claim was actually "dispositive" of the Plaintiffs' § 1983 claim and clearly, it is not. A nonconstitutional ground is not dispositive if the constitutional issue "could have entitled [the plaintiff] to relief beyond that to which they were entitled" under a ruling on the nonconstitutional ground. *Lyng*, 485 U.S. at 446-47 (court would address First Amendment issue because its resolution would entitle respondents to more robust injunction than was available pursuant to an available statutory claim). Here, as explained above, it has never been disputed that the remedies that the Plaintiffs have sought under § 1983—in particular, compensatory damages for past denied benefits—are not available under state law.

34

(*See* App. 18.)  A determination that the Defendants violated state law does not fully dispose of this case.  *Cf. also Deakins v. Monaghan*, 484 U.S. 193, 202-03 (1988) (because federal courts have *duty* to exercise jurisdiction where it exists, district court was required to at most "stay rather than dismiss" federal claim for monetary relief "not cognizable in [a] parallel state proceeding"); *Simpson v. Rowan*, 73 F.3d 134, 138-39 (7th Cir. 1995) (applying *Deakins* in § 1983 case); Dkt. 81:3 (opinion below noting that this Court's decision created a "bit of a mystery" in part because the federal constitutional issues "formed the basis for the plaintiffs' claim for damages.") (App. 3.)

It is helpful to consider what *would* count as a dispositive state-law claim.  Had the Plaintiffs, for example, challenged the federal constitutionality of the entire state transportation framework, a state-law ruling that interpreted the statute in a way that eliminated any constitutional questions would be dispositive.  In such a case it might make sense for this Court to decide the state law claim first or abstain until a state court had done so.  But, as this Court itself has noted, St. Augustine has specifically "disclaim[ed] any challenge to" Wisconsin's transportation framework. (App. 108.)  This is instead the exact type of § 1983 claim that the *Zinermon* Court contemplated:

> A plaintiff, for example, may bring a § 1983 action for an unlawful search and seizure despite the fact that the search and seizure violated the State's Constitution or statutes, and despite the fact that there are common-law remedies for trespass and conversion. As was noted in *Monroe*, in many cases *there is "no quarrel with the state laws on the books"; instead, the problem is the way those laws are or are not implemented by state officials.*

35

*Zinermon*, 494 U.S. at 124-25 (quoting *Monroe*, 365 U.S. at 176) (citation omitted) (emphasis added). That it is now established that the Defendants violated state law does not resolve whether the Plaintiffs are entitled to federal remedies like damages for the violation of their First Amendment rights.

Finally, to the extent that this Court considers it a relevant consideration, its decision did not, as the District Court mistakenly thought, bar it from resolving the federal constitutional claim. This Court clearly did not believe that it was ending the case. It "conclude[d] that it was error to rule for the state," but instead of ruling on the Plaintiffs' motion for summary judgment outright it remanded for that purpose. (App. 206.) This Court noted that *it* did not "find it necessary to reach any constitutional issues in this case"; it did not forbid the District Court from doing so. (*Id.* at 204.) St. Augustine notified the Seventh Circuit in its petition for clarification that the logical effect of its decision would be the resolution of the constitutional claim below. (R. 82:10–11.) This Court easily could have corrected this view if it felt St. Augustine's position were foreclosed by its decision but did not do so and left it to the parties to litigate.

Regardless, even if the District Court was barred, that was an erroneous prohibition and this Court can correct it now by proceeding to the constitutional claims. The District Court denied those claims in dicta specifically so that another remand would not be necessary to determine how the District Court would decide them. (*See* App. 16.)

**II.    The Defendants violated the Plaintiffs' First Amendment rights when they denied the Plaintiffs otherwise-available public benefits "for reasons that can be tied to [the Plaintiffs'] religious preference" and based "exclusively . . . on a doctrinal determination" the Defendants had made.**

Again, under Wisconsin's private school transportation aid program, the attendance areas of "private schools affiliated or operated by a single sponsoring group" may not overlap. *Vanko*, 52 Wis. 2d at 215.  St. Augustine does not challenge this framework.  Indeed, under that framework, St. Augustine is entitled to benefits: it is undisputed that there are no legal, operational, or other secular connections between St. Augustine and either St. Gabriel or the Roman Catholic Church as represented by the local Archdiocese of Milwaukee; further, it is undisputed that St. Augustine considers itself to be within the Catholic tradition, but religiously distinct from the schools of the Archdiocese.

However, despite these two undisputed facts, the Defendants repeatedly denied benefits to St. Augustine solely because it and a neighboring school each referred to themselves with the same religious label—"Catholic."  They denied benefits even as St. Augustine protested that it considered itself separate and distinct.  The question presented is whether the Defendants' policy for determining affiliation—which was to make the religious label a party assigns to itself, *as interpreted by the state*, the determinative factor rather than relying on secular and neutral evidence of affiliation such as corporate structure, common ownership, common management, and so on—violated the First Amendment.  It did, on three independent grounds.

**A.      The Defendants violated the Establishment Clause by defining St. Augustine's denominational affiliation.**

Perhaps the easiest manner in which to dispose of this case is to begin with St. Augustine's Establishment Clause argument.  This is the simplest approach because this Court's second decision, which is now the law of the case, makes it so clear that such a violation occurred.

The Supreme Court's test for Establishment Clause violations set forth in *Lemon v. Kurtzman* prohibits, among other things, "excessive entanglement" between the state and religion.  *Lemon*, 403 U.S. at 613-14.  Deciding whether two schools are sufficiently religiously alike—particularly when they say they are not—such that they ought to be considered affiliated, violates this rule against excessive entanglement.  There is no way to make such a judgment without evaluating competing religious claims even if that evaluation consists of cavalierly dismissing them.  The Defendants could not conclude St. Augustine is "Catholic" in the same way as the schools of the Archdiocese without making a judgment as to what being "Catholic" is.  *See, e.g.*, *New York v. Cathedral Academy*, 434 U.S. 125, 133 (1977) ("prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment").

Indeed, in the decision accompanying its earlier (now-vacated) judgment, this Court agreed that "[h]ad the defendants applied a religious test to establish denominational affiliation, we can assume that they would have violated *Lemon*'s

prohibition of entanglement between government and religion." (App. 78.) Four years after making that observation, this Court confirmed, immediately after citing *Lemon*, that such a "religious test to establish denominational affiliation" was applied:

> [T]he Superintendent's decision in the case before us was not justified by neutral and secular considerations, but instead necessarily and exclusively rested on a doctrinal determination that both St. Augustine and St. Gabriel's were part of a single sponsoring group—the Roman Catholic church—because their religious beliefs, practices, or teachings were similar enough.

(*Id.* at 198.)

The District Court concluded that it was not bound by this statement of the law by this Court but even if it was bound that the entanglement was not "excessive." (App. 24–29.) First, the District Court was wrong that it was not bound. Although this Court did not decide any constitutional issues, it acknowledged that a governmental inquiry into a school's religious beliefs, practices, or teachings would constitute excessive entanglement and that the Plaintiffs had conducted such an inquiry, (App. 197–98); this was the entire reason for reversal (albeit under state law). It would be hard to find a statement that is more intended to be "law of the case" then the express statement of the law by this Court as its reasoning for reversing the District Court. *See Delgado v. U.S. Dep't of Justice*, 979 F.3d 550, 557 (7th Cir. 2020).

Even if free to do so, the District Court was likewise wrong to conclude that the Defendants' supposedly "isolated determination," even if improper, could not

count as "excessive" entanglement under *Lemon*.  (App. 28.)  Religious decision-making by government "cannot be dismissed by saying it will happen only once." *Cathedral Academy*, 434 U.S. at 133.  And in any event, this was not an "isolated" occurrence.  Attendance area review typically occurs annually, *see* Wis. Stat. § 121.54(2)(b)3., and St. Augustine has suffered harm for multiple school years. Further, the Defendants' "labels" policy logically applies to "Roman Catholics and Protestants . . . Presbyterians and Baptists . . . Sunni and Shi'a Muslims, and . . . Orthodox and Reform Jews, just to name a few examples."  (App. 202.)  Indeed, it could apply to St. Augustine vis-à-vis not just other groups using the label "Catholic," but, for example, those calling themselves "Christian."  This case is concerned with more than a single act.

In *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022), issued after this Court's recent remand, the Supreme Court appeared to indicate that the *Lemon* test is a dead letter in its entirety, including its excessive entanglement prong, and that in its place a Court must consider "historical practices and understandings." *Kennedy*, 142 S. Ct. at 2427-28 (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)).  The District Court below assumed, in contrast, that excessive entanglement analysis was still governing law despite *Kennedy*.  (App. 24 n.4.)

In this case, it does not matter which test applies because applying historical understandings produces the same result.  The Supreme Court has consistently held that the state may not "evaluate" religious claims, make religious decisions, or otherwise insert itself into religious conduct and practices.  *See, e.g., Lyng*, 485 U.S.

at 457-58 (requiring Court "to rule that some religious adherents misunderstand their own religious beliefs" puts it "in a role that [it was] never intended to play"); *United States v. Lee,* 455 U.S. 252, 257 (1982) (refusing to assess the "proper interpretation of the Amish faith"); *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 451 (1969) (explaining that courts may not "engage in the forbidden process of interpreting and weighing church doctrine"); *United States v. Ballard*, 322 U.S. 78, 87 (1944) (avoiding the "forbidden domain" of evaluating religious doctrine).  Yet that is precisely what the Defendants did here when they told St. Augustine, against its will, that when it and St. Gabriel used the term "Catholic" they mean the same thing.

### B.     The Defendants violated the Free Exercise Clause by forcing St. Augustine to choose between following its faith tradition and the receipt of otherwise-available government benefits.

Alternately, or in addition, this Court could decide this case by resolving the issue for which the Supreme Court vacated and remanded this Court's 2018 decision: whether the Defendants violated the Supreme Court's ruling that under the Free Exercise Clause the government may not "bar[] religious schools from public benefits solely because of the religious character of the schools" and may not " bar[] parents who wish to send their children to a religious school from those same benefits, again solely because of the religious character of the school."  *Espinoza*, 140 S. Ct. at 2255. The Defendants did violate it.

*Espinoza* involved a Montana scholarship program that provided tuition assistance to parents enrolling their children in private schools, including religious

schools. *Espinoza*, 140 S. Ct. at 2251.  After the Montana Supreme Court struck down the program on the basis of a state constitutional provision "which prohibits any aid to a school controlled by a 'church, sect, or denomination,'" *id.*, three mothers with children who attended a private religious school asked the Supreme Court to rule that the application of that so-called "no-aid provision" violated the Free Exercise Clause, *id.* at 2251-52.

The Supreme Court agreed that it did, building on the propositions from its earlier case, *Trinity Lutheran*, that "[t]he Free Exercise Clause . . . 'protects religious observers against unequal treatment' and against 'laws that impose special disabilities on the basis of religious status'" and  that "disqualifying otherwise eligible recipients from a public benefit 'solely because of their religious character' imposes 'a penalty on the free exercise of religion that triggers the most exacting scrutiny.'"  *Id.* at 2254-55 (quoting *Trinity Lutheran*, 137 S. Ct. at 2021).

Montana's Constitution, the *Espinoza* Court explained, violated these principles by compelling schools to "divorce [themselves] from any religious control or affiliation" before they could become "eligible for government aid."  *Id.* at 2256. Similarly, it "put[] families to a choice between sending their children to a religious school or receiving such benefits."  *Id.* at 2257.  This result forced a dilemma on religious adherents which triggered strict scrutiny, a standard Montana could not meet.  *Id.* at 2260-61.

The District Court was wrong when it said that the same is not true here. Under the Defendants' policy, St. Augustine could only obtain benefits by refusing to

say they are Catholic because the Defendants determined that "Catholic" means the same thing to everyone all the time.  Likewise, families had to choose between obtaining benefits and sending their children to a school that aligns with their religious beliefs.  In fact, in its most recent decision, the Seventh Circuit *agreed* that the Defendants "*withh[eld] state benefits for reasons that can be tied to the religious preference of the disfavored group*" (here St. Augustine).  (App. 205 (emphasis added).)  That is flatly inconsistent with *Espinoza*.

The *only* significant difference between *Espinoza* and this case is that Montana's policy required schools to disclaim *any* religious identity, whereas the Defendants' requires schools to disclaim *particular* religious identities.  *This is not a material difference*.  It is wholly irrelevant for constitutional purposes whether the government tells a citizen "you may not call yourself religious if you want benefits" or "you may not call yourself a Catholic if you want benefits."  The relevant question under the First Amendment is whether, through "indirect coercion," *Espinoza*, 140 S. Ct. at 2256 (quoting *Trinity Lutheran*, 137 S. Ct. at 2022), the government is penalizing the manner in which a citizen chooses to exercise his or her religion. *Espinoza* itself contains passages emphasizing this point, *see id*. at 2255 ("a State 'cannot exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, because of their faith, or lack of it, from receiving the benefits of public welfare legislation' (quoting *Everson v. Board of Ed. of Ewing*, 330 U.S. 1, 16 (1947)) (emphasis removed)); *id*. (a state may not tell a church "that it cannot subscribe to a *certain view*

43

of the Gospel" (quoting *Trinity Lutheran*, 137 S. Ct. at 2022) (emphasis added)), as does *Trinity Lutheran*, *see Trinity Lutheran*, 137 S. Ct. at 2021 (state "may not discriminate against '*some or all* religious beliefs'" (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993)) (emphasis added)). The Defendants' policy works in precisely this manner, requiring St. Augustine to disavow the religious title it has given to itself if it wants to become eligible for state aid, simply because an unaffiliated group lays claim to the same religious title. *Espinoza* prohibits such a rule and requires reversal.

The District Court suggested that the Defendants' policy is saved because it treats religious and non-religious schools the same. (App. 22.) That is wrong on two grounds. First, the rule that "valid and neutral law[s] of general applicability" comport with the Free Exercise Clause, *see Employment Division v. Smith*, 494 U.S. 872, 879 (1990) (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring)), is limited to "government regulation of physical acts" (like the smoking of peyote that occurred in *Smith*) rather than "government interference with an internal church decision that affects the faith and mission of the church itself." *Trinity Lutheran*, 137 S. Ct. at 2021 n.2 (quoting *Hosanna-Tabor*, 565 U.S. at 190). This case involves the latter—selection of religious title and what that title signifies.

Second, regardless, the Defendants' policy is not neutral and generally applicable. The Defendants did not look to corporate, secular factors for affiliation (which could be applied equally to non-religious schools) such as common ownership, common management, common employees, etc. Instead, they determined that St.

44

Augustine and St. Gabriel were affiliated because they both used the same religious moniker of "Catholic" and must, therefore, share religious beliefs. This is a religious test, even if a superficial one, and it penalizes religious adherents. Unlike secular entities, which may offer whatever evidence they wish to show affiliation or non-affiliation and may freely discuss the meaning of the labels they assign to themselves, religious entities are forbidden from doing so because, as this Court put it in its 2018 decision, courts may not "consider[] whether a difference in belief constitutes a difference in denomination." (App. 81–82) (citing *Presbyterian Church*, 393 U.S. 440); *see also Kennedy*, 142 S. Ct. at 2422 (*Smith* does not apply if policy facially discriminates or its object is religious exercise or if policy provides mechanism for individualized exemptions).[6]

### C. The Defendants violated the Religion Clauses by interfering with St. Augustine's ability to define its faith and doctrine.

Finally, the Supreme Court has developed a line of cases, resting on both Religion Clauses, protecting the autonomy of religious organizations. The Defendants' actions contravene the rule of these cases.

Specifically, the Supreme Court has declared that "religious organizations" have a right to a degree of "independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church

---

[6] That St. Augustine could have obtained benefits if it had applied first does not save the Defendants' policy either. (*See* App. 21.) In that instance, the Defendants' policy would have denied *St. Gabriel* benefits and penalized that school for its beliefs. This might have affected St. Augustine's standing, but not the constitutionality of the policy.

government *as well as those of faith and doctrine.*" *Hosanna-Tabor*, 565 U.S. at 181, 186 (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 116 (1952) (describing *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1872))) (emphasis added). Accordingly, "[s]tate *interference* in [the] sphere" of "matters 'of faith and doctrine' . . . would obviously violate the free exercise of religion, and *any* attempt by government to dictate *or even to influence* such matters would constitute one of the central attributes of an establishment of religion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020) ("*OLG*") (quoting *Hosanna-Tabor*, 565 U.S. at 186) (emphases added)).

It is hard to envision a more fundamental statement of faith and doctrine than the theological title a religious organization assigns to itself and its own interpretation of what that title signifies. Yet the Defendants interfered with the Plaintiffs' ability to exercise this autonomy by forcing St. Augustine to choose between receiving state aid and using the religious name St. Augustine prefers— "Catholic"—and by taking it upon themselves to define the word "Catholic"—a religious duty inappropriate for a state actor.

The District Court erred when it said that the Defendants' policy was consistent with *OLG* and cases like it. (App. 29–31.) The policy exerts unconstitutional pressure on the Plaintiffs to choose a different religious name for themselves, and it impermissibly allows state actors to determine, in the words of this Court's vacated opinion, the "face value" of religious labels such as the word "Catholic." (App. 80.) In other words, it constitutes "government interference with

an internal church decision that affects the faith and mission of" St. Augustine itself. *OLG*, 140 S. Ct. at 2062 (quoting *Hosanna-Tabor*, 565 U.S. at 190). "The First Amendment outlaws such intrusion." *Id.* at 2060.

*OLG* is illuminating specifically on the issue of how religious labels should be assessed by civil courts. The *OLG* Court was faced with the question of how to determine whether a particular employment position qualifies as a "minister" for purposes of the ministerial exception. In specifically disclaiming the notion that the use of labels like "minister" was dispositive, the Court explained:

> If titles were all-important, courts would have to decide which titles count and which do not, and it is hard to see how that could be done without looking behind the titles to what the positions actually entail. Moreover, attaching too much significance to titles would risk privileging religious traditions with formal organizational structures over those that are less formal.

*Id.* at 2064. Much the same thing occurred here: the Defendants concluded that titles were completely dispositive of religious affiliation. While they putatively did so in order to avoid having to "look[] behind the titles," their actions accomplished the same result: they imputed meaning to those titles, assuming that "Catholic" as used by one group is the same as "Catholic" as used by an unaffiliated group. As suggested by Judge Ripple in dissent in this Court's initial opinion, this approach violates the "right of each individual to define personal religious beliefs not according to institutional norms but according to *personal* religious commitments," (App. 92 (Ripple, J., dissenting)), effectively privileging adherents of well-established, well-recognized religious institutions.

The alternative is not a "deep-dive into the nuances of religious affiliation," (App. 80); the Plaintiffs agree that would be improper.  The alternative, instead, is to respect St. Augustine's right of autonomy in the areas of faith, doctrine, and religious mission, and take it at its word when it says it is not religiously affiliated with the schools of the Milwaukee Archdiocese.  By failing to do so, the Defendants violated the First Amendment.[7]

## III.    The Plaintiffs are entitled to $9,000 in money damages, declaratory relief, and injunctive relief.

If this Court agrees that the Defendants violated the Plaintiffs' constitutional rights, it could, as it did in December of 2021, remand for a determination of federal remedy, given that the District Court never reached the issue.  But because the parties already fully briefed this question below, because any questions involved are legal, and to avoid the need for yet another appeal following another remand in this already very lengthy litigation, the Court should decide the remedy question now.

---

[7] At this late stage of the litigation, the only matters in dispute between the parties with respect to proving a § 1983 claim are whether the Defendants violated the First Amendment and if so what remedies are due.  Indeed, the Defendants have never contested that if St. Augustine shows that the Defendants violated its constitutional rights, it has otherwise properly established the elements of a claim under 42 U.S.C. § 1983.  Given that St. Augustine already established, in the first round of summary judgment briefing, that any other elements were met, (*see, e.g.*, Dkt. 23:21–27), and given that the Defendants have long since waived their right to argue otherwise, St. Augustine will not address the matter further. It reserves the right to do so in response/reply if warranted.

*Cf., e.g., Auto. Mechanics Loc. 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 748 (7th Cir. 2007) (deciding cross-motions for summary judgment in the first instance because the motions were fully briefed, the question presented was legal, there were no disputes of material fact, and the record was adequate, such that "[r]emanding this case to the district court would . . . not accomplish anything useful"). The record shows the Plaintiffs are entitled to $9,000 in money damages, declaratory relief, and injunctive relief.[8]

### A. The Forros are entitled to $9,000 in damages from Friess Lake School District.

"Ordinarily, to obtain an award of compensatory monetary damages under § 1983, a plaintiff must demonstrate both that he has suffered an 'actual' present injury and that there is a causal connection between that injury and the deprivation of a constitutionally protected right caused by a defendant." *Henderson v. Sheahan*, 196 F.3d 839, 848 (7th Cir. 1999).

In violating the Forros' First Amendment rights the Defendants denied the Forros the transportation benefits to which they were entitled. The Forros have been damaged in the amount of $1,500 per year for each year from the 2015-2016 school year through the 2020-2021 school year (after which the Forros moved and withdrew their children from St. Augustine School). (*See* Dkt. 77 at ¶¶2–3, 5; Dkt. 59 at ¶59.) The $1,500 amount comes from a November 10, 2015 letter from John Engstrom

---

[8] The Plaintiffs reserve the right to move for costs and attorney's fees in a post-judgment motion. *See* 42 U.S.C. § 1988; Fed. R. Civ. P. 54(d).

(District Administrator for Friess Lake). (Dkt. 26-7 at 2.) In that letter, Mr. Engstrom indicated that the annual cost of a parent contract for the Forros would be $1,500. (*Id.*)

To explain further, there are several ways that a public school district can provide transportation to children attending private schools. The public school district may 1) transport them directly in a bus owned by the school district, 2) contract with a third party to transport them, or 3) have the parents transport the children and reimburse the parents through what is referred to as a parent contract. Wis. Stat. § 121.55. The monetary cost of options 1 and 2 are not known but the monetary cost of option 3 is known. It is the $1,500 set forth in Mr. Engstrom's letter.

Further, the Plaintiffs submitted a set of Proposed Findings of Fact in support of their original motion for summary judgment which included the following: "If Friess Lake provided a parent contract to the Forros, Friess Lake has said that the cost to the district would be $1,500 per school year." (Dkt. 22 at ¶28.) The Defendants jointly responded that they had "[n]o dispute" to this proposed fact. (Dkt. 39 at ¶28.) During the second round of summary judgment proceedings, the Defendants again did not dispute this number and Friess Lake (which would owe the damages) in fact agreed with the $1,500 figure. (Dkt. 69:8 n.3.)

St. Augustine requested transportation benefits for the Forros for each of the six school years from 2015-2016 through 2020-2021 (the year before the Forros moved) pursuant to its 2015-16 attendance area proposal. (*See, e.g.*, Dkt. 77 at ¶¶2-3). Friess Lake never provided those benefits. (*See id.* at ¶5.)

Based upon the above, the Forros request a damages award of $9,000 ($1,500 per year for 6 years). Additionally, the Plaintiffs request nominal damages (to be set by the Court) because of the "completed violation" of their First Amendment rights. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801-802 (2021).

### B.   The Plaintiffs are entitled to a declaratory judgment and St. Augustine is entitled to a permanent injunction.

"A declaratory judgment serves to 'settle the particular controversy and clarify the legal relations at issue.'" *Duncan Place Owners Ass'n v. Danze, Inc.*, 927 F.3d 970, 977 (7th Cir. 2019) (quoting *NUCOR Corp. v. Aceros y Maquilas de Occidente*, 28 F.3d 572, 579 (7th Cir. 1994)).   Here a declaration is needed to resolve the continuing uncertainty over the Plaintiffs' First Amendment rights vis-à-vis the Defendants when applying for transportation benefits.

The Plaintiffs request a declaration in the following or a similar form:

> The Court declares that the decisions by Friess Lake School District and the Wisconsin Superintendent of Public Instruction denying St. Augustine School its requested attendance area under Wis. Stat. Sections 121.51-121.55 and denying transportation benefits to the Forros violated St. Augustine School's and the Forros' rights under the First Amendment.

Such a declaration is consistent with the demand in the Complaint and is a plain and simple declaration of the violations established herein.

Similarly, St. Augustine requests a permanent injunction, which is appropriate where the plaintiff has shown "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between

the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). These factors are met here. Irreparable harm is generally presumed for First Amendment violations, *see, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011), "and money damages are therefore inadequate," *Joelner v. Vill. of Washington Park, Illinois*, 378 F.3d 613, 620 (7th Cir. 2004). Likewise, "it is always in the public interest to protect First Amendment liberties," *id.* (quoting *Connection Distrib. Co.*, 154 F.3d 281, 288 (6th Cir. 1998)), and the Defendants cannot point to any hardship to them if an injunction issues.

St. Augustine requests an injunction in the following or a similar form:

> The Defendants are enjoined from continuing to violate St. Augustine School's First Amendment rights as found herein and specifically enjoined from denying St. Augustine School its requested attendance area under Wis. Stat. Sections 121.51-121.55 and denying transportation benefits to the families with children attending St. Augustine School who otherwise meet the requirements of Wis. Stat. Section 121.54(2)(b)1.

## CONCLUSION

For the foregoing reasons, the Plaintiffs respectfully request that this Court (1) reverse the District Court's partial denial of the Plaintiffs' motion for summary judgment and the partial grant of the Defendants' motions for summary judgment, (2) direct the District Court to grant the Plaintiffs' motion for summary judgment as to their federal claim and to deny the Defendants' motions for summary judgment; and (3) direct the District Court to award money damages to the Forros in the amount

of $9,000, permanent injunctive relief to St. Augustine, and declaratory relief to the Plaintiffs.

Dated: November 16, 2022.

Respectfully submitted,

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

*s/ Anthony F. LoCoco*

Richard M. Esenberg (WI Bar No. 1005622)
*Counsel of Record*
Anthony F. LoCoco (WI Bar No. 1101773)
330 E. Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Facsimile: (414) 727-6385
Rick@will-law.org
ALoCoco@will-law.org
*Attorneys for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify the following:

This brief complies with the word limit of Cir. R. 28.1 because it contains 13,995 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Cir. R. 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced font using the 2016 version of Microsoft Word in 12-point Century Schoolbook font (11-point in the footnotes).

Dated: November 16, 2022.

*s/ Anthony F. LoCoco*
Anthony F. LoCoco

# CERTIFICATE OF SERVICE

I certify that on November 16, 2022, I electronically filed the foregoing Brief, Short Appendix and Appendix with the clerk of court using the CM/ECF system, and that in addition to the electronic notice and service of the same through CM/ECF, two copies of the Brief (with attached Short Appendix) and one copy of the Appendix each have been sent to the following via first-class mail and electronic mail:

> Lori M. Lubinsky
> Danielle Baudhuin Tierney
> Axley Brynelson LLP
> Manchester Place
> 2 E. Mifflin St., Suite 200
> Madison, WI 53701
> llubinsky@axley.com
> dtierney@axley.com
>
> Hannah S. Jurss
> Laura M. Varriale
> Wisconsin DOJ
> 17 W. Main Street
> P.O. Box 7857
> Madison, WI 53707
> jursshs@doj.state.wi.us
> laura.varriale@dpi.wi.gov

Dated this 16th day of November, 2022.

s/ Anthony F. LoCoco

Anthony F. LoCoco

**APPENDIX**

**CIR. R. 30(a) APPENDIX TABLE OF CONTENTS**

**Description of Document**                                          **Page(s)**

Decision and Order of the United States District Court
for the Eastern District of Wisconsin
(September 19, 2022) (Dkt. 81) ............................................................ App. 1–32

Final Judgment of the United States District Court
for the Eastern District of Wisconsin
(September 19, 2022) (Dkt. 82) ............................................................... App. 33

**CIRCUIT RULE 30(d) CERTIFICATION**

I certify that the appendices bound with and accompanying this

brief contain all of the materials required by Circuit Rule 30 (a) and (b).

*/s/ Anthony F. LoCoco*
ANTHONY F. LOCOCO

56

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ST. AUGUSTINE SCHOOL, et al.,**
            **Plaintiffs,**

            **v.**                                        **Case No. 16-C-0575**

**JILL UNDERLY, in her official capacity**
**as Superintendent of Public Instruction,**
**et al.,**
            **Defendants.**

---

## DECISION AND ORDER

This case, which has a long procedural history, involves a Wisconsin law that requires local school districts to provide transportation benefits to private schools. *See* Wis. Stat. §§ 121.51, 121.54. Under the law, as interpreted by the Wisconsin Supreme Court, only one school affiliated with or operated by a single "sponsoring group" may receive benefits within a single attendance area. The law allows religious schools to receive benefits. However, a religious denomination is considered a "sponsoring group" for purposes of the rule limiting benefits to one school per sponsoring group per attendance area.

In 2015, St. Augustine School applied for transportation benefits for three of its students. St. Augustine is a Roman Catholic school, and at the time it applied for benefits, a different Roman Catholic school, St. Gabriel, was already receiving transportation benefits for an attendance area that overlapped with St. Augustine's. For this reason, the local school district denied St. Augustine's benefits claim. St. Augustine then appealed to the state superintendent of public instruction, claiming that St. Augustine, unlike St. Gabriel, was not affiliated with the Archdiocese of Milwaukee and therefore was not

App. 1

affiliated with or operated by the same sponsoring group as St. Gabriel. The state superintendent denied St. Augustine's appeal.

Following the denial, St. Augustine and parents of some of its students filed the present action in Wisconsin state court against the school district and the superintendent. They alleged, among other things, that the denial of benefits violated their rights under state law and the Free Exercise and Establishment Clauses of the First Amendment. The defendants removed the case to this court. In June 2017, I issued an order denying relief on the plaintiffs' federal claims and relinquishing supplemental jurisdiction over the state claims. *St. Augustine Sch. v. Evers*, 276 F. Supp. 3d 890 (E.D. Wis. 2017). The plaintiffs appealed, and the Seventh Circuit initially affirmed. *St. Augustine Sch. v. Evers*, 906 F.3d 591 (7th Cir. 2018). The plaintiffs then filed a petition for certiorari with the Supreme Court of the United States. The Supreme Court granted the petition, vacated the Seventh Circuit's order, and remanded the case to the Seventh Circuit for reconsideration in light of *Espinoza v. Montana Department of Revenue*, 591 U.S. __, 140 S. Ct. 2246 (2020).

On remand, the Seventh Circuit certified a question of state law to the Wisconsin Supreme Court. After the state supreme court answered the question, *see St. Augustine Sch. v. Taylor*, 398 Wis. 2d 92 (2021), the Seventh Circuit reconsidered the case and decided that, as a matter of state law, the plaintiffs were entitled to transportation benefits. *St. Augustine Sch. v. Underly*, 21 F.4th 446 (7th Cir. 2021). The court also concluded that, because the plaintiffs were entitled to benefits under state law, the court did not need "to reach any constitutional issues in this case." *Id.* at 451. The Seventh Circuit remanded the case to me to determine whether any plaintiff was entitled to monetary damages or injunctive relief.

2

As discussed in more detail below, the Seventh Circuit's latest opinion creates a bit of a mystery. The court said that it was deciding the case under state law, but by that point in the case the plaintiffs had abandoned their state-law claims. Moreover, the court determined that a decision on federal constitutional issues was unnecessary, even though those issues were the only ones remaining in the case and formed the basis for the plaintiffs' claims for damages. These aspects of the court's opinion have led to a dispute among the parties over what I am to decide on remand. The plaintiffs contend that I must decide the merits of their federal claims, while the defendants contend that I am limited to determining whether the plaintiffs are entitled to damages or injunctive relief under state law.

In this opinion, I attempt to carry out the Seventh Circuit's instructions.

## I. BACKGROUND

### A. Wisconsin's System for Providing Transportation Benefits to Private Schools

Wisconsin law requires the school board of a school district to provide each student residing in the district with transportation to and from his or her school if the student resides two miles or more from the school. Wis. Stat. § 121.54(2). The school board must provide transportation even to students who attend a private school—even a religious private school—but only "if such private school is a school within whose attendance area the pupil resides" and the school is located either within the school district or within five miles of the district's boundaries. *Id.* § 121.54(2)(b)1. The "attendance area" is the geographic area designated by the private school as the area from which it draws its students, but the school board of the district must also approve the attendance area. *Id.* § 121.51(1). If the private school and the school board cannot agree on the attendance

3

area, the state superintendent of public instruction must, upon the request of the private school and the school board, make a final determination of the attendance area. *Id.* As is relevant to this case, the law provides that "[t]he attendance areas of private schools affiliated with the same religious denomination shall not overlap." *Id.*

To avoid a constitutional problem, the Wisconsin Supreme Court long ago determined that the prohibition on overlapping attendance areas must apply to all private schools, not just to religious private schools. *State ex real. Vanko v. Kahl*, 52 Wis. 2d 206, 215 (1971). The court understood the statute to prohibit "overlapping in attendance area boundary lines as to *all* private schools affiliated or operated by a single sponsoring group, whether such school operating agency or corporation is secular or religious." *Id.* The *Vanko* court recognized that this interpretation of the statute seemed to reduce the "same religious denomination" sentence in § 121.51 to "mere surplusage." *Id.* However, the court determined that this sentence still added something to the statute, which was "to make 'affiliated with the same religious denomination' the test of affiliation in a single school system rather than operation by a single agency or set of trustees or religious order within a particular religious denomination." *Id.* The court gave the following example:

> [The sentence] means that, if the Franciscan Order of the Roman Catholic church operates a school in the northern part of the Racine district, and the Jesuit Order operates a school in the southern part of the district, they are to be considered, along with diocesan schools, as part of the Catholic school system of Racine because all are "affiliated with the same religious denomination."

*Id.* at 215–16.

In a subsequent case, *Holy Trinity Community School, Inc. v. Kahl*, 82 Wis. 2d 139 (1978), the court considered the question of how state officials were to determine whether a private school is affiliated with a particular religious denomination. The court concluded

4

that, to avoid "excessive entanglement of state authority in religious affairs," *id.* at 150, state officials could not determine the affiliation of a religious school by monitoring and evaluating its practices or personnel, *id.* at 150–53. Instead, officials were to "accept the *professions* of the school and to accord them validity without further inquiry." *Id.* at 155 (emphasis added).

## B.    The Plaintiffs' Requests for Transportation Aid

St. Augustine is a private elementary and high school that, at the time when this action was filed, was located in Hartford, Wisconsin. It has since relocated by a few miles to Colgate, Wisconsin, but this move did not affect its attendance area. The school has described itself to this court as "an independent religious school that teaches and operates in a manner that its Board of Directors believes is consistent with the long-standing traditions of the Catholic faith." (Decl. of Tim Zignego ¶ 3, ECF No. 26.) The school is controlled by its own board of directors and is not affiliated with the Archdiocese of Milwaukee or any religious order of the Catholic church.

From 2015 to 2021, plaintiffs Joseph and Amy Forro sent their three children to St. Augustine.[1] During those years, the Forros lived within the Friess Lake School District, which, in 2018, merged with another school district to become the Holy Hill Area School District. On April 27, 2015, St. Augustine sent a letter to the school district requesting transportation benefits for the Forro children pursuant to Wis. Stat. § 121.54. In the letter,

---

[1] Because the Forros no longer send their children to St. Augustine, their claim for injunctive relief is moot. However, they are still proper parties because they seek damages for the denial of transportation aid for the years in which they sent their children to St. Augustine.

5

St. Augustine described itself as "an independent, private Catholic school." (Zignego Decl., Ex. D at 1, ECF No. 26-4.) St. Augustine also stated that it was not affiliated with the Archdiocese of Milwaukee. (*Id.*)

In responding to St. Augustine's request for benefits, the school district noted that it already provided transportation benefits to St. Gabriel, a Roman Catholic school that had the same attendance area as St. Augustine. (Zignego Decl., Ex. G, at 1, ECF No. 26-7.) The school district acknowledged that St. Augustine was "incorporated under a different charter" than St. Gabriel, but it concluded that because both schools claimed affiliation with the religious denomination known as Roman Catholicism, the school district could not provide the Forro children with transportation to and from St. Augustine. (*Id.*)

After St. Augustine and the school district failed to agree on an attendance area, they submitted their dispute to the state superintendent of public instruction for a final determination under Wis. Stat. § 121.51(1). In its letter to the superintendent, St. Augustine argued, as it did to the school district, that its attendance area could overlap with St. Gabriel's because St. Gabriel was a Roman Catholic school affiliated with the Archdiocese of Milwaukee, while St. Augustine was independent of the Archdiocese. (Zignego Decl., Ex. I, at 1–2, ECF No. 26-9.) The school district argued that St. Augustine and St. Gabriel could not have overlapping attendance areas because they both described themselves as Catholic schools and therefore were, for purposes of § 121.51(1), affiliated with the same religious denomination, even if they were each incorporated under a different charter. (Aff. of Laura Varriale, Ex. F, ECF No. 33-6.) The school district provided the superintendent with print-outs from St. Augustine's website,

6

which described the school as "an independent and private traditional Roman Catholic School." (*Id.* at ECF p. 5 of 10.)

On March 10, 2016, the superintendent, through his designee, issued a written decision. (Zignego Decl., Ex. J, ECF No. 26-10.) After stating the parties' positions and discussing the relevant legal authority, the superintendent noted that St. Augustine had not submitted any governing documents, such as articles of incorporation, that identified its religious affiliation. The superintendent determined that, in the absence of a statement of religious affiliation in St. Augustine's governing documents, the school district was allowed to use the statement of religious affiliation on St. Augustine's public website to determine whether it was affiliated with the same religious denomination as St. Gabriel. The superintendent also determined that the website showed that St. Augustine was "a religious school affiliated with the Roman Catholic denomination." (*Id.* at 7.) Because St. Gabriel was also affiliated with that denomination and was already receiving state aid to transport students within St. Augustine's attendance area, the superintendent upheld the school district's determination that St. Augustine was not entitled to transportation aid.

## C. The Present Lawsuit and First Appellate Decision

After the superintendent affirmed the school district's decision to deny transportation aid to St. Augustine students, the plaintiffs filed this lawsuit in state court. The defendants were the state superintendent (then Tony Evers) in his official capacity and the Friess Lake School District. The plaintiffs alleged claims under state and federal law. Their state-law claim sought either an order declaring that the decision by the school district and the superintendent violated Wis. Stat. §§ 121.51–121.55, or certiorari review of the superintendent's administrative decision. (Compl. ¶¶ 71–73.) The plaintiffs' federal

claims alleged violations of the Free Exercise and Establishment Clauses and sought relief under 42 U.S.C. § 1983.[2] (Compl. ¶¶ 59–69.) The plaintiffs sought injunctive relief against the superintendent in his official capacity and damages against the school district.

After the parties filed cross-motions for summary judgment, I determined that the plaintiffs' state-law claim presented a novel question of state law and relinquished supplemental jurisdiction over it pursuant to 28 U.S.C. § 1367(c)(1). *St. Augustine*, 276 F.Supp.3d at 895. Turning to the federal claims, I first determined that the defendants had not violated the Religion Clauses by treating a religious school differently than they would have treated similarly situated nonreligious private schools. That was so, I determined, because the rule allowing benefits for only one private school per sponsoring group per attendance area applied to both religious and nonreligious schools. Further, the plaintiffs had not presented evidence from which a reasonable trier of fact could conclude that the defendants would have evaluated the plaintiffs' claim for benefits differently had St. Augustine been a nonreligious school. Here, I noted that the defendants might have decided that two unaffiliated Montessori schools were part of the same "sponsoring group," just as they determined that two unaffiliated Catholic schools were part of the same sponsoring group. *Id.* at 900–01.

I also addressed the plaintiffs' claim that the defendants' decisions resulted in "excessive entanglement" and therefore violated the Establishment Clause. Here, I noted that excessive entanglement, which is a concept that derives from *Lemon v. Kurtzman*, 403 U.S. 602 (1971), ordinarily applies to entire statutory schemes rather than to single

---

[2] The plaintiffs also alleged that the defendants' conduct violated the Equal Protection Clause, but they have since abandoned that claim. (ECF No. 60 at 14 n.9.)

decisions by government officials attempting to implement such schemes. Because the plaintiffs were challenging a single, potentially erroneous application of state law rather than the state law itself, I determined that excessive entanglement was not a viable legal theory. *St. Augustine*, 276 F. Supp. 3d at 901–02. In the alternative, I found that the defendants' decisions did not result in excessive entanglement because the defendants did not attempt to observe and classify St. Augustine's religious practices and beliefs. Instead, they accepted St. Augustine's own representation of itself on its website as a Roman Catholic school. *Id.* at 902–03.

The plaintiffs appealed the part of my summary-judgment decision that granted judgment to the defendants on the merits of the federal claims. In their appellate brief, the plaintiffs explicitly represented to the Seventh Circuit that they were not appealing my decision to relinquish supplemental jurisdiction over the state-law claims. (Pls. App. Br. at 14 n.5.) The defendants did not cross-appeal the judgment relinquishing supplemental jurisdiction or argue that my decision to do so involved an abuse of discretion.

In its first decision in this case, the Seventh Circuit, with one judge dissenting, affirmed the entry of judgment for the defendants on the merits of the federal claims. *St. Augustine*, 906 F.3d at 600. The court summarized its decision as follows:

> Contrary to the plaintiffs' assertions, the record does not establish that the Superintendent or the school district furnished or withheld public benefits on the basis of non-neutral religious criteria. Nor does the evidence support the claim that public officials impermissibly determined the school's affiliation on the basis of theology, ecclesiology, or ritual. Instead, it shows that public officials applied a secular statute that limits benefits to a single school affiliated with *any* sponsoring group—and, when St. Augustine declared itself to be Catholic, they took the school at its word.

906 F.3d at 593.

9

**D.    Additional Appellate Proceedings**

Following the Seventh Circuit's initial decision, the plaintiffs filed a petition for a writ of certiorari in the Supreme Court of the United States. After the Supreme Court decided *Espinoza v. Montana Department of Revenue*, 591 U. S. __, 140 S. Ct. 2246 (2020), it granted the plaintiffs' petition, vacated the Seventh Circuit's judgment, and remanded the case to the Seventh Circuit for further consideration in light of *Espinoza*. On remand, the Seventh Circuit asked the parties to file briefs that addressed the effect of the Supreme Court's decision in *Espinoza* and whether a then-undecided Supreme Court case, *Fulton v. City of Philadelphia, Penn.*, 593 U.S. __, 141 S.Ct. 1868 (2021), might affect the outcome of this case.

After the parties filed the requested briefs, the Seventh Circuit entered an order in which it stated that, although the case was originally about whether the defendants had violated the Religion Clauses, it had since "boiled down to one dispositive question of state law: what methodology for determining affiliation is required under the relevant Wisconsin statutes?" *St. Augustine School v. Taylor*, No. 17-2333, 2021 WL 2774246, at *2 (7th Cir. Feb. 16, 2021). The court expressed the view that, if the defendants had made an error of state law, then there would be "no need for [the court] to say anything further about the Religion Clauses of the U.S. Constitution." *Id.* However, by that time, no state-law claims were left in the case because I had relinquished supplemental jurisdiction over them and no party had appealed that part of my decision. In any event, because the Seventh Circuit deemed the state-law question dispositive, it decided, on its own initiative, to certify the question to the Wisconsin Supreme Court. The court defined the certified question in the following terms:

10

> For purposes of determining whether two or more schools are "private schools affiliated with the same religious denomination" for purposes of Wis. Stat. § 121.51, must the state superintendent rely exclusively on neutral criteria such as ownership, control, and articles of incorporation, or may the superintendent also take into account the school's self-identification in sources such as its website or filings with the state.

*Id.* at *3. The Wisconsin Supreme Court accepted the certification and (with two justices dissenting) gave the following answer:

> We conclude that, in determining whether schools are "affiliated with the same religious denomination" pursuant to Wis. Stat. § 121.51, the Superintendent is not limited to consideration of a school's corporate documents exclusively. In conducting a neutral and secular inquiry, the Superintendent may also consider the professions of the school with regard to the school's self-identification and affiliation, but the Superintendent may not conduct any investigation or surveillance with respect to the school's religious beliefs, practices, or teachings.

*St. Augustine Sch. v. Taylor*, 398 Wis. 2d 92, 637 (2021).

Back in the Seventh Circuit, the court interpreted the answer provided by the Wisconsin Supreme Court to mean that the superintendent was not limited to considering St. Augustine's corporate documents. *St. Augustine*, 21 F.4th at 448. However, the Seventh Circuit also understood that "as a matter of state law," the superintendent could not "delve into 'the school's religious beliefs, practices, or teachings,' because the latter inquiry would transgress the First Amendment prohibition against excessive entanglement with religious matters." *Id.* at 448–49 (quoting *Lemon*, 403 U.S. at 613). The Seventh Circuit then concluded that, in the present case, the superintendent's decision "was not justified by neutral and secular considerations, but instead necessarily and exclusively rested on a doctrinal determination that both St. Augustine and St. Gabriel's were part of a single sponsoring group—the Roman Catholic church—because their religious beliefs, practices, or teachings were similar enough." *Id.* at 449. The court

11

reasoned that "[t]he fact that the Superintendent reached this result largely just by looking at St. Augustine's description of itself on its website does not matter—the doctrinal conclusion was an inescapable part of the decision." *Id.* Based on this reasoning, the Seventh Circuit held that the superintendent violated state law by denying benefits to St. Augustine. The court also determined that, in light of its state-law holding, it was not "necessary to reach any constitutional issues in this case." *Id.* at 451.

The Seventh Circuit then reversed my "grant of summary judgment in favor of the state defendants." *Id.* at 452–53. The court said nothing about that part of my decision or the resulting judgment that relinquished supplemental jurisdiction over the plaintiffs' state-law claims. But the court also wrote that "[b]ecause the case was dismissed before the district court had occasion to determine the amount of monetary damages (if any) to which the Forros or St. Augustine might be entitled, or what type of injunctive relief (if any) for any plaintiff is proper," the court would remand the case to me "for further proceedings consistent with this opinion." *Id.*

The plaintiffs filed a petition for panel rehearing with the Seventh Circuit. They pointed out that the only claim for relief before the court was their claim under 42 U.S.C. § 1983 for violation of the First Amendment. They also pointed out that, even if the defendants had violated state law by denying them benefits, they were still entitled to a decision on their constitutional claims because the existence of remedies under state law does not preclude a cause of action under § 1983. The plaintiffs told the Seventh Circuit that they believed that it was "unclear what cause of action [the Seventh Circuit] intends the district court [to] assess on remand for purposes of awarding relief." (Pet. for Reh'g at 1.) The plaintiffs also told the Seventh Circuit that they intended to pursue their federal

12

claims on remand and asked the Seventh Circuit to clarify whether I was permitted to consider them. (*Id.* at 7–8.) Without ordering a response from the defendants, the Seventh Circuit denied the petition for rehearing and provided no further clarification of its opinion.

## E.    Current Proceedings

When the case returned to this court, I asked the parties to file motions for summary judgment in which they addressed the effect of the Seventh Circuit's latest opinion and argued the merits of any potential state and federal claims. Those motions have been filed, and the superintendent (now Jill Underly) has renewed a motion to dismiss the claims against her that she had filed during earlier proceedings in the district court.

In their motion for summary judgment, the plaintiffs contend that I must decide the merits of their constitutional claims. The plaintiffs insist that their state-law claims were dismissed when I relinquished supplemental jurisdiction, and they do not contend that they are entitled to relief under state law in this action. Instead, they contend that the defendants violated the Free Exercise and Establishment Clauses of the First Amendment when they denied transportation benefits to St. Augustine and the Forros for each school year between 2015 and the present. The plaintiffs seek an injunction against both defendants to provide benefits and damages against the school district under § 1983 for each year in which the Forros were denied transportation aid.

The defendants, in turn, contend that the Seventh Circuit's latest decision precludes me from considering any federal claims. The school district contends that I am limited to declaring that St. Augustine and St. Gabriel are unaffiliated and determining whether the plaintiffs are entitled to injunctive relief or damages under state law. The

13

superintendent contends that I may not even consider whether the plaintiffs are entitled to relief under state law because the plaintiffs did not appeal my decision to relinquish supplemental jurisdiction over the state-law claim. The superintendent also contends that, even if I may award relief in connection with a claim, the plaintiffs' claim for an injunction is moot because the school district, in accordance with the Seventh Circuit's opinion, is now providing transportation to St. Augustine students. In her motion to dismiss, the superintendent also contends that she is not liable for damages, but this argument is unnecessary because the plaintiffs are not seeking damages from the superintendent in the first place. (Pls. Reply Br. at 30, ECF No. 72.) In the alternative, both defendants contend that the plaintiffs' federal claims fail on the merits.

## II. DISCUSSION

The first order of business is to determine what the Seventh Circuit wants me to decide on remand. Because the Seventh Circuit disposed of the appeal under state law, said in its opinion that there is no need "to reach any constitutional issues in this case," *St. Augustine*, 21 F.4th at 451, and remanded the case for me to consider whether the plaintiffs are entitled to injunctive relief or damages, the most natural interpretation of the opinion is that the court implicitly reinstated the plaintiffs' state-law claim and then remanded for a determination of whether the plaintiffs are entitled to relief under state law. Although the court did not expressly prohibit me from considering the merits of the plaintiffs' constitutional claims, such a prohibition seems to be implied in the court's own decision to refrain from deciding those claims. The court seems to have thought that a decision in the plaintiffs' favor under state law rendered a decision on the constitutional claims unnecessary. And if such a constitutional decision was unnecessary on appeal,

14

then it should also be unnecessary on remand to the district court. This is not a case in which I declined to consider the constitutional claims prior to the appeal and the Seventh Circuit remanded to me for a decision in the first instance. *See, e.g., Planned Parenthood of Ind. & Ky., Inc. v. Marion Cnty. Prosecutor*, 7 F.4th 594, 606 (7th Cir. 2021) (taking no position on constitutional arguments that the district court did not address and remanding to the district court to consider them in the first instance). Instead, I decided those claims, and the Seventh Circuit held that, in light of its resolution of the state-law issue, it did not need to determine whether my decision was correct. All of this implies that the Seventh Circuit believes that its decision under state law has removed the constitutional claims from this case.

The plaintiffs contend that the Seventh Circuit's decision does not preclude me from considering the merits of their constitutional claims because the Seventh Circuit (1) overlooked the fact that the plaintiffs had abandoned their state-law claim and (2) erred in thinking that a decision under state law made consideration of the constitutional claims unnecessary. Regarding the first point, the plaintiffs note that I remanded the state-law claim to state court prior to the first appeal and that the plaintiffs did not challenge that decision on appeal or otherwise put the state-law claim before the Seventh Circuit. The plaintiffs expressly state that the state-law claim "is no longer at issue in this suit." (Pls. Br. at 14–15, ECF No. 60.) Regarding the second point, the plaintiffs cite several cases supporting the proposition that the existence of overlapping state remedies does not prevent a plaintiff from seeking relief under federal law via 42 U.S.C. § 1983. (*Id.* at 15 (citing, among other cases, *Monroe v. Pape*, 365 U.S. 167 (1961), and *Zinermon v. Burch*, 494 U.S. 113 (1990)).

15

Although I generally agree with the plaintiffs on these points, I do not believe that I am free to grant relief on the constitutional claims on remand. That is so because the plaintiffs' two points amount to an argument that the Seventh Circuit erred in holding that a decision on the constitutional claims was unnecessary. A district court may not, on remand, disregard the instructions of a higher court simply because it thinks that the higher court made a mistake. *See, e.g., Barrow v. Falck*, 11 F.3d 729, 731 (1993); *Cole Energy Dev. Co. v. Ingersoll-Rand Co.*, 8 F.3d 607, 609 (7th Cir. 1993). There is an exception to this rule that applies when "it is apparent that the higher court has committed a serious and demonstrable error . . . in circumstances where correction by filing a petition for rehearing in the higher court would not have been feasible." *Cole*, 8 F.3d at 609. But that exception cannot apply here because the plaintiffs filed a petition for rehearing on this very point that the Seventh Circuit denied. Thus, to carry out the Seventh Circuit's instructions, I must decide whether the plaintiffs are entitled to an injunction and damages under state law and also must abide by its express determination that a decision on the constitutional claims is unnecessary.

Nonetheless, because the plaintiffs will almost certainly file another appeal, I believe it makes sense to express my view on how the constitutional claims would turn out if I were free to reconsider them. Expressing my view on the outcome of the constitutional claims now avoids the possibility that the Seventh Circuit will determine that I erred in thinking that its mandate precluded me from considering the constitutional claims and then remanding the case to me for a third time to consider the merits in the first instance.

16

Below, I will first discuss whether the plaintiffs are entitled to relief under state law. I will then indicate how I would decide the constitutional claims if I were free to decide them.[3]

## A.     Injunctive Relief and Damages Under State Law

As noted above, I understand the Seventh Circuit to have implicitly reinstated the plaintiffs' state-law claim and instructed me to determine whether the plaintiffs are entitled to injunctive relief or damages under state law. However, in their briefs on remand, the plaintiffs have refused to argue that they are entitled to relief under state law. Instead, they continue to insist that their state-law claim was remanded to state court and is no longer part of this case. (Pls. Br. at 14–15, ECF No. 60; Pls. Reply Br. at 6, ECF No. 72.) The plaintiffs rely exclusively on federal law when arguing that they are entitled to injunctive relief and damages (Pls. Br. at 28–31), and they point to no provision of state law that entitles them to either an injunction or damages.

In response to the Seventh Circuit's decision, the school district approved St. Augustine's attendance area and is now providing transportation to St. Augustine students. (*See* ECF No. 78-1.) St. Augustine has therefore received some benefit from the Seventh Circuit's decision under state law. However, because the plaintiffs have

---

[3] The defendants also raise issues concerning the relief to which the plaintiffs could obtain in connection with their federal claims. For example, they claim that the request for an injunction is moot because the school district has already approved St. Augustine's attendance area and is providing transportation to its students. However, I need not decide these issues. Even if the request for injunctive relief is moot, the plaintiffs continue to press a claim for damages against the school district, which means that there is still a live controversy against at least one defendant. The existence of that live controversy provides Article III jurisdiction to decide the merits of the plaintiffs' claims. And because the federal claims will ultimately fail on the merits, I need not resolve the parties' disputes over what remedies would be appropriate.

17

explicitly disavowed any claim for relief under state law, I conclude that they have waived any entitlement to damages or injunctive relief under state law. *See, e.g., Walsh v. Alight Solutions, LLC*, 44 F. 4th 716, 723 (7th Cir. 2022) (waiver is the intentional relinquishment or abandonment of a known right).

Although I do not have the benefit of briefing by the parties on this issue, I also note that damages and injunctive relief appear to be unavailable in an action for common law certiorari under Wisconsin law. *See Coleman v. Percy*, 96 Wis. 2d 578, 588–89 (1980). Because certiorari is the only state claim identified in the complaint (other than a request for declaratory relief), *see* Compl. ¶¶ 71–73, the plaintiffs would likely not be entitled to an injunction or damages under state law even if they did not abandon their claim for such relief.

Still, because the Seventh Circuit has already found that the defendants violated state law by refusing to approve St. Augustine's attendance area, I will enter a declaratory judgment that embodies this state-law ruling. However, I will award no other relief to the plaintiffs under state law.

## B.     Merits of Constitutional Claims

In their constitutional claims, the plaintiffs contend that the decisions of the school district and the superintendent to deny transportation to St. Augustine students violated both the Free Exercise and Establishment Clauses of the First Amendment. The plaintiffs do not allege that any part of the Wisconsin framework for awarding transportation benefits to private schools is unconstitutional on its face. (Pls. Br. at 19, ECF No. 60.) Rather, the plaintiffs contend that the defendants' erroneous application of that framework

18

resulted in violations of the First Amendment that would not have occurred if the defendants had followed state law. (*Id.* at 20.)

### 1.    Free Exercise Clause

"The Free Exercise Clause, which applies to the States under the Fourteenth Amendment, 'protects religious observers against unequal treatment' and against 'laws that impose special disabilities on the basis of religious status.'" *Espinoza*, 140 S. Ct. at 2254 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S.__, 137 S.Ct. 2012, 2021 (2017)). In cases decided since I last considered the plaintiffs' claims, the Supreme Court distilled its precedents "into the 'unremarkable' conclusion that disqualifying otherwise eligible recipients from a public benefit 'solely because of their religious character' imposes 'a penalty on the free exercise of religion that triggers the most exacting scrutiny.'" *Id.* at 2255 (quoting *Trinity Lutheran*, 137 S. Ct. at 2021). Relying on these recent cases, the plaintiffs contend that the defendants' decision to deny them benefits violated the Free Exercise Clause because it penalized them for holding themselves out as Roman Catholic.

The plaintiffs rely primarily on the Supreme Court's decision in *Espinoza*, which was the basis for the Supreme Court's grant, vacate, and remand order in the present case. *Espinoza* involved a Montana scholarship program that provided tuition assistance to parents enrolling their children in private schools, including religious schools. *Id.* at 2251. After the Montana Supreme Court determined that the program violated a state constitutional provision that prohibited aid to a school controlled by a "church, sect, or denomination," several parents asked the Supreme Court to rule that this application of the Montana constitution violated the Free Exercise Clause. *Id.* at 2251–52. The Supreme

19

Court held that it did. The court noted that the scholarship program created a generally available public benefit, and that the application of the "no aid" provision barred religious schools from that benefit "solely because of the religious character of the schools." *Id.* at 2255. The Court stressed that, "[t]o be eligible for government aid under the Montana Constitution, a school must divorce itself from any religious control or affiliation." *Id.* at 2256. The Court said that "[p]lacing such a condition on benefits or privileges 'inevitably deters or discourages the exercise of First Amendment rights.'" *Id.* (quoting *Trinity Lutheran*, 137 S. Ct. at 2022). The Court noted that the "[t]he Free Exercise Clause protects against even 'indirect coercion,'" and that "a State 'punishe[s] the free exercise of religion' by disqualifying the religious from government aid as Montana did here." *Id.* The Court also noted that the application of the "no aid" provision burdened the parents' free-exercise rights because it disqualified them from otherwise available benefits "if they choose a religious private school rather than a secular one, and for no other reason." *Id.* at 2261.

In the present case, unlike in *Espinoza*, the state benefits program does not exclude religious schools. To the contrary, the Wisconsin busing law expressly allows religious schools to receive benefits. *See* Wis. Stat. § 121.51(1). St. Augustine and the Forros were denied benefits not because St. Augustine was a religious school, but because the benefits program limits benefits to one school per sponsoring group per attendance area, and the defendants determined that St. Augustine was affiliated with a sponsoring group that was already receiving transportation aid in the applicable attendance area. As the Seventh Circuit put it in its original decision, the plaintiffs were

20

denied benefits not because St. Augustine was a religious school, but because it was "second in line." *St. Augustine*, 906 F.3d at 597.

Of course, in its second opinion, the Seventh Circuit determined that the defendants made a mistake in applying state law when they concluded that St. Augustine and St. Gabriel were affiliated with the same sponsoring group. Still, the defendants did not deny the plaintiffs a benefit "*solely* because of their religious character." *Espinoza*, 140 S. Ct. at 2255 (emphasis added). Had St. Augustine applied for benefits before St. Gabriel, the defendants undoubtedly would have granted its request, even if St. Augustine professed to be Roman Catholic and even if the defendants processed its application under the same erroneous view of Wisconsin law. This, again, shows that it was the defendants' regarding St. Augustine as being second in line, rather than St. Augustine's religious character alone, that resulted in the denial of benefits.

The plaintiffs recognize that because the Wisconsin busing statute does not disqualify religious schools from receiving benefits, this case is different than *Espinoza*, but they contend that this difference is immaterial because the defendants required religious schools to "disclaim *particular* religious identities" to receive benefits. (Pls. Br. at 24 (emphasis in original).) But the defendants clearly did not deny the plaintiffs benefits based on a belief that no school that calls itself Roman Catholic was eligible for benefits, which is what they would have had to have done to impose a penalty on a particular religious identity. The defendants denied the plaintiffs benefits because another school that called itself Roman Catholic was already receiving benefits for the attendance area. This decision was based on the statutory rule that only one school affiliated with a single sponsoring group could receive benefits within a single attendance area.

21

Moreover, the defendants' misunderstanding of how to administer the "sponsoring group" rule did not impose a penalty on religious schools that would not have been imposed on nonreligious schools under the same circumstances. The Seventh Circuit held that, to comply with the Wisconsin Supreme Court's interpretation of the rule, which was designed to avoid excessive entanglement in religious affairs, the defendants should not have taken it upon themselves to decide that two schools that professed to be Roman Catholic were affiliated with the same sponsoring group. *St. Augustine*, 21 F.4th at 450–52. The defendants' failure to comply with this interpretation of the statue potentially implicated the Establishment Clause and the entanglement doctrine (which I discuss below), but it did not result in a free-exercise violation because the defendants did not apply a rule to religious schools that they would not have applied to nonreligious schools. As the Seventh Circuit noted in its first opinion, the defendants' interpretation of the statute "bars two self-identified Catholic schools from receiving transit subsidies, but it also bars funding two Montessori schools, two International Baccalaureate® schools, or two French International schools." *St. Augustine*, 906 F.3d at 597. Thus, the "penalty" created by the defendants' erroneous interpretation of the statute applied equally to religious and nonreligious schools. It cannot be regarded as a penalty on religious schools or particular religious identities.

In their reply brief, the plaintiffs sum up their free-exercise argument by contending that the defendants "put the Plaintiffs to a choice between exercising their religion and participating in society on equal terms with others." (Reply Br. at 16.) But, as explained above, that clearly is not what the defendants did. In this case, the "equal terms" included the rule allowing only one school per sponsoring group per attendance area. The

22

defendants may have made a mistake in thinking that St. Augustine was affiliated with a sponsoring group that was already receiving benefits for the transportation area, but they did not single out religious private schools in general, or specific religious beliefs and practices in particular, for unfavorable treatment. Thus, they did not put the plaintiffs to a choice between exercising their religion and receiving benefits under the same terms as any other school.

In short, because the rule as applied by the defendants did not cut St. Augustine off from benefits "for no other reason" than that it was a religious school, *Espinoza*, 140 S. Ct. at 2261, the defendants' denial of benefits did not violate the Free Exercise Clause.

## 2. Establishment Clause

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." The plaintiffs contend that the defendants' erroneous application of the Wisconsin busing law violated the Establishment Clause because it resulted in "excessive entanglement" between government officials and religious institutions. "Excessive entanglement" is one of the three prongs of the test announced in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). Under the *Lemon* test, a court evaluating whether a government practice violates the Establishment Clause must consider: (1) whether the practice has a secular legislative purpose; (2) whether its principal or primary effect either advances or inhibits religion; and (3) whether the practice fosters an excessive government entanglement with religion. *Id.* at 612–13. The plaintiffs do not

contend that the defendants' decision violated the first two prongs. Rather, they focus on excessive entanglement only.[4]

In its most recent decision in this case, the Seventh Circuit determined that the defendants made an error of state law when they relied on St. Augustine's self-identification as a Roman Catholic school to conclude that St. Augustine and St. Gabriel were affiliated. The Seventh Circuit understood the Wisconsin Supreme Court to have interpreted the busing statute in a way that avoided entanglement concerns, and it found that the defendants violated this prophylactic interpretation by making a "doctrinal determination that both St. Augustine and St. Gabriel's were part of a single sponsoring group—the Roman Catholic church—because their religious beliefs, practices, or teachings were similar enough." *St. Augustine*, 21 F.4th at 449.

The plaintiffs contend that the court's statement that the defendants made a "doctrinal determination" must be regarded as a finding of excessive entanglement that is now binding on me as law of the case. I disagree. First, the court expressly declined to decide any constitutional issue, and so it has made no express or implied ruling on excessive entanglement that could be regarded as law of the case. *See, e.g., Delgado v. U.S. Dep't of Justice*, 979 F.3d 550, 557 (7th Cir. 2020) (stating that the law-of-the-case doctrine applies to issues "expressly or impliedly decided by a higher court"). Second,

---

[4] In a recent case, the Supreme Court wrote that it "long ago abandoned *Lemon* and its endorsement test offshoot." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. __, 142 S. Ct. 2407, 2427 (2022). Thus, it is possible that the Supreme Court no longer regards excessive entanglement as an Establishment Clause violation. However, in *Kennedy*, the Court was primarily concerned with the "endorsement test offshoot" of the *Lemon* test, which is not implicated in this case. Thus, I will assume that the entanglement prong of the *Lemon* test remains good law.

24

even if the court's conclusion that the defendants made a doctrinal determination is binding on me, it would not follow that the defendants *excessively* entangled themselves in religious affairs. That is so because "[e]ntanglement is a question of kind and degree." *Lynch v. Donnelly*, 465 U.S. 668, 684 (1984); *Agostini v. Felton*, 521 U.S. 203, 233 (1997) (noting that "[n]ot all entanglements . . . have the effect of advancing or inhibiting religion" and stating that the Court "[has] always tolerated some level of involvement between" the state and religion). Thus, I must independently decide whether the defendants' act of entanglement amounted to excessive entanglement.

Turning to that question, I first note that we are here dealing with a single, erroneous application of state law, not a state law or ongoing policy that itself fosters entanglement with religion. The decision to deny the plaintiffs' benefits was made as part of a single administrative proceeding in which the decisionmakers attempted to apply the busing law to a unique circumstance in which a school that described itself as Roman Catholic claimed to be unaffiliated with another self-described Roman Catholic school. This fact weighs against a finding of excessive entanglement, for there was no overarching statutory scheme or policy that required repeated inquiry into religious affairs.

For two reasons, the plaintiffs dispute that this case involves only a single application of the busing statute. First, they contend that the defendants applied their own "*policy* for determining religious affiliation." (Pls. Reply Br. at 11 (emphasis in original).) The plaintiffs seem to be claiming that, if given the chance, the defendants would have repeatedly denied benefits to schools that self-identified as being associated with the same religious denomination as another school that already received benefits, even if the school disclaimed affiliation with the other school. But there is no evidence that, in this

25

case, the defendants were applying a preconceived policy rather than making an ad hoc determination based on a unique set of facts. In any event, the important point is that the defendants applied their erroneous methodology for determining affiliation only once, and so no excessive entanglement actually occurred. Second, the plaintiffs contend that the defendants' decision had the effect of denying the plaintiffs benefits for multiple school years. But even if that were true, it would not change the fact that there was only one administrative decision and therefore only one instance of the defendants' mistakenly entangling themselves in a matter of religious doctrine.

The plaintiffs also contend that even a single governmental action can result in excessive entanglement. They point out that, in *New York v. Cathedral Academy*, the Supreme Court stated that an excessive-entanglement problem "cannot be dismissed by saying it will happen only once." 434 U.S. 125, 133 (1977). But the plaintiffs take this statement out of context. The governmental action that the Court described as "happening only once" was an audit of claims for government benefits "by approximately 2,000 [religious] schools in amounts totaling over $11 million." *Id.* During the audit, the state would have "review[ed] in detail all expenditures for which reimbursement is claimed, including all teacher-prepared tests, in order to assure that state funds are not given for sectarian activities." *Id.* at 131–32. This audit would have involved thousands of individual determinations of whether classroom materials contained religious content. Obviously, such a massive inquiry is different in "kind and degree," *see Lynch*, 465 U.S. at 684, than a single administrative determination that two schools that call themselves Roman Catholic are, for that reason, affiliated with the same religious denomination.

26

Moreover, even if a single application of a law could rise to the level of excessive entanglement, here the defendants' involvement in religious affairs was not so great as to be excessive. The defendants did not perform any "comprehensive, discriminating, and continuing state surveillance" to determine whether St. Augustine and St. Gabriel were Roman Catholic. *Lemon*, 403 U.S. at 619. Instead, the defendants used St. Augustine's own statement on its website that it was Roman Catholic to determine that it was affiliated with Roman Catholicism, which is typically regarded as a single religious denomination by non-experts. Although the Seventh Circuit stated in its latest opinion that the defendants made a "doctrinal determination" that the "religious beliefs, practices, or teachings" of St. Augustine and St. Gabriel were "similar enough," *St. Augustine*, 21 F. 4th at 449, the court did not find that the defendants actually examined the religious beliefs and practices of each school to make this determination. Instead, the court found that the defendants' reliance on the "Catholic" label alone inherently involved a doctrinal determination, "even if only modestly." *Id.* at 452.

Finally, in a separate case, the Seventh Circuit recognized that an impermissible government involvement in a matter of religious doctrine will not necessarily rise to the level of excessive entanglement. In *Nelson v. Miller*, a Catholic prisoner claimed that the prison's chaplain violated the Establishment Clause by requiring him, but not adherents of other faiths, to provide written verification that his religious beliefs required him to consume a vegan diet. 570 F.3d 868, 880–81 (7th Cir. 2009), *abrogated on other grounds by Jones v. Carter*, 915 F.3d 1147, 1149–50 (7th Cir. 2019). The Seventh Circuit rejected this claim. As part of its analysis, the Seventh Circuit noted that the chaplain "improperly entangled him[self] in matters of religious interpretation" by sending the prisoner a letter

27

in which he cited Bible passages and argued with the prisoner over whether he was interpreting his faith correctly. *Id.* at 881. The chaplain's belief that the plaintiff's interpretation of his own religion was incorrect caused him to deny the plaintiff's request for a religious diet. *Id.* at 872. However, recognizing that entanglement is a question of "kind and degree," the court concluded that the chaplain's one-time act of entanglement did not rise to the level of excessive entanglement and therefore did not violate the Establishment Clause. *Id.*

The present case is like *Nelson*, in that the defendants' foray into a matter of religious doctrine, which resulted in a denial of a government accommodation, occurred only once. Moreover, the defendants' actions here were less invasive than was the chaplain's in *Nelson* because the defendants did not argue with the plaintiffs over the correctness of their religious beliefs or practices. Instead, the defendants thought that, by relying on St. Augustine's description of itself as Catholic and not examining its actual religious practices, they were *avoiding* entanglement in religious affairs. Accordingly, Seventh Circuit precedent supports the conclusion that the defendants did not excessively entangle themselves with religion.

In short, the defendants made an isolated determination that two schools that described themselves as Roman Catholic were affiliated with the same religious denomination. To make this determination, the defendants did not examine any school's or person's actual religious beliefs or practices or purport to define the tenets of Roman Catholicism. They simply took the schools' professions at face value and decided that, because the schools used identical words (Roman Catholic), they were affiliated. Their actions did not involve "intrusive government participation in, supervision of, or inquiry

28

into religious affairs." *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 995 (7th Cir. 2006) (quoting *United States v. Indianapolis Baptist Temple*, 224 F.3d 627, 631 (7th Cir.2000)). Accordingly, the defendants did not violate the Establishment Clause.

### 3.    Claim Based on the "Ministerial Exception"

Finally, the plaintiffs pursue a third legal theory that relies on Supreme Court cases defining the so-called "ministerial exception" to generally applicable employment laws.[5] Under this exception, which is based on the Religion Clauses, "courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. __, 140 S.Ct. 2049, 2060 (2020); *see also Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012). The holdings of these cases have no application here because this case does not involve an attempt to enforce an employment law against St. Augustine. Nonetheless, the plaintiffs contend that some of the language used in the majority opinions in these cases shows that the defendants violated the Religion Clauses when they determined that St. Augustine was affiliated with St. Gabriel.

In the cases involving the ministerial exception, the Supreme Court stated that "the Religion Clauses protect the right of churches and other religious institutions to decide matters 'of faith and doctrine' without government intrusion." *Our Lady of Guadalupe*, 140 S. Ct. at 2060 (quoting *Hosanna-Tabor*, 565 U.S. at 186). The Court then said that "[s]tate interference in that sphere would obviously violate the free exercise of religion, and any

---

[5] The defendants contend that the plaintiffs waived this argument by not presenting it in earlier proceedings. Because the argument fails on the merits, I will not discuss waiver.

attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion." *Id.* The plaintiffs contend that the defendants violated these principles when they determined that St. Augustine was affiliated with St. Gabriel because they both used the label "Roman Catholic." However, the defendants did not interfere with St. Augustine's decision-making on matters of faith and doctrine or even attempt to influence those matters. Instead, they attempted to *identify* St. Augustine's religious denomination. Even if, in trying to identify St. Augustine's religious denomination, the defendants entangled themselves in religion, they certainly did not try to change or influence St. Augustine's actual religious beliefs, practices, or teachings.

The plaintiffs seem to suggest that the defendants attempted to influence their religious practices by denying them benefits on the ground that they called themselves Catholic. However, as I explained in the context of the plaintiffs' claim under the Free Exercise Clause, the defendants did not deny the plaintiffs benefits because they were Catholic but because they were second in line. Even under the defendants' erroneous interpretation of the busing law, the plaintiffs would have received benefits had St. Augustine been the first Roman Catholic school to request benefits in the attendance area. It is true that the busing law creates an incentive for a school to change its religious affiliation if a school of the same denomination already receives benefits within the attendance area—that's what the school in *Holy Trinity* did, *see* 82 Wis.2d at 146—but it does not follow from this that the state adopted the rule of one school per sponsoring group per attendance area for the purpose of encouraging schools to change their religious affiliations. Obviously, the purpose of the rule is to limit the local school district's

30

obligation to provide benefits to one school per sponsoring group, not to encourage private schools to break away from sponsoring groups to qualify for benefits.

The plaintiffs also point to language in *Our Lady of Guadalupe* that deemphasizes the role of religious titles in determining whether an employment position falls within the ministerial exception:

> If titles were all-important, courts would have to decide which titles count and which do not, and it is hard to see how that could be done without looking behind the titles to what the positions actually entail. Moreover, attaching too much significance to titles would risk privileging religious traditions with formal organizational structures over those that are less formal.

140 S. Ct. at 2064. The plaintiffs contend that this language means that the defendants violated the Religion Clauses when they determined that St. Augustine was affiliated with a different school because both schools used the label "Roman Catholic." But to make this argument, the plaintiffs take the quotation from *Our Lady of Guadalupe* out of context. The Court was not saying that the government violates the Religion Clauses every time it assigns significance to a religious title or label. To the contrary, the Court's prior case involving the ministerial exception held that the title of the employee was a factor that a court could consider when determining whether the exception applies. *See Hosanna-Tabor*, 565 U.S. at 191–92. In the passage that the plaintiffs quote, the Court was explaining that, because the lack of a religious title is not dispositive of whether an employee holds a position of religious significance within the church, factors other than the employee's title must also be considered to determine whether the ministerial exception applies. The Court was not implying that a single determination by the state, made for purposes of administering a government benefits program, that imputed significance to a religious label would violate the Religion Clauses.

31

Accordingly, I reject the plaintiffs' argument based on the ministerial exception.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the plaintiffs' motion for summary judgment (ECF No. 59) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted to the extent that the court will enter the following declaratory judgment as a remedy for the defendants' violation of state law:

> The court declares that the Friess Lake School District (now part of the Holy Hill Area School District) and the Wisconsin Superintendent of Public Instruction violated Wis. Stat. § 121.51(1) by failing to approve the attendance area requested by St. Augustine School in 2015.

In all other respects, the motion is denied.

**IT IS FURTHER ORDERED** that the school district's motion for summary judgment (ECF No. 68) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted on all claims other than the claim for declaratory relief under state law.

**IT IS FURTHER ORDERED** that the superintendent's motion for summary judgment (ECF No. 65) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted on all claims other than the claim for declaratory relief under state law.

**IT IS FURTHER ORDERED** that the superintendent's motion to dismiss (ECF No. 65) is **DENIED**.

**FINALLY, IT IS ORDERED** that the Clerk of Court shall enter final judgment.

Dated at Milwaukee, Wisconsin, this 19th day of September, 2022.


/s/Lynn Adelman_____
LYNN ADELMAN
United States District Judge


32

AO 450 (Rev. 5/85) Judgment in a Civil Case ⊗

# United States District Court

## EASTERN DISTRICT OF WISCONSIN

**JUDGMENT IN A CIVIL CASE**

ST. AUGUSTINE SCHOOL and
JOSEPH and AMY FORRO,
          Plaintiffs

v.                                              CASE NUMBER: 16-C-0575

JILL UNDERLY, in her official capacity
as Superintendent of Public Instruction, and
FRIESS LAKE SCHOOL DISTRICT,
          Defendants

☐    **Jury Verdict.**  This action came before the Court for a trial by jury.  The issues
       have been tried and the jury has rendered its verdict.

☑    **Decision by Court.**  This action came to trial or hearing before the Court.  The
       issues have been tried or heard and a decision has been rendered.

       IT IS ORDERED AND ADJUDGED that judgment is entered in favor of the
defendants on all claims, other than the plaintiff's claim for a declaratory judgment for
violation of Wisconsin law. The court declares that the Friess Lake School District (now
part of the Holy Hill Area School District) and the Wisconsin Superintendent of Public
Instruction violated Wis. Stat. § 121.51(1) by failing to approve the attendance area
requested by St. Augustine School in 2015.

| | |
|---|---|
| September 19, 2022 | Gina M. Colletti |
| Date | Clerk |
| | /s/K. Rafalski |
| | (By) Deputy Clerk |